**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| U.S. ETHERNET INNOVATIONS, LLC, <br>     Plaintiff, <br><br> v. <br><br> TEXAS INSTRUMENTS INCORPORATED, <br>     Defendant. | No. 6:11-CV-491-MHS-JDL <br><br> PATENT CASE |
| U.S. ETHERNET INNOVATIONS, LLC, <br>     Plaintiff, <br><br> v. <br><br> RICOH AMERICAS CORPORATION, <br>     Defendant. | No. 6:12-cv-00235-MHS-JDL <br> LEAD CASE <br><br> JURY TRIAL DEMANDED |
| U.S. ETHERNET INNOVATIONS, LLC, <br>     Plaintiff, <br><br> v. <br><br> TRENDNET, INC., <br><br> XEROX CORPORATION, <br><br> KONICA MINOLTA BUSINESS SOLUTIONS U.S.A., INC., et al., <br><br> DIGI INTERNATIONAL INC., et al., <br><br> CIRRUS LOGIC, INC., et al., <br><br> SAMSUNG ELECTRONICS CO., LTD., et al., <br><br> NETGEAR, INC. and <br><br> STMICROELECTRONICS N.V., et al., <br>     Defendants. | Consolidated with: <br><br><br><br><br> No. 6:12-cv-00236-MHS-JDL <br><br> No. 6:12-cv-00237-MHS-JDL <br><br> No. 6:12-cv-00329-MHS-JDL <br><br> No. 6:12-cv-00351-MHS-JDL <br><br> No. 6:12-cv-00366-MHS-JDL <br><br> No. 6:12-cv-00398-MHS-JDL <br><br> No. 6:12-cv-00399-MHS-JDL <br><br> No. 6:12-cv-00481-MHS-JDL |

**U.S. ETHERNET INNOVATIONS, LLC'S REPLY TO
DEFENDANTS' *MARKMAN* BRIEF**

## TABLE OF CONTENTS

                                                                                                        **Page**

I.      TERMS IN DISPUTE ........................................................................................................... 1

           A.      "network interface device"; "network interface adapter"; "network adapter"; "network adapter device" ............................................................... 1

           B.      "indication value"; "first indication signal"; "first masked signal"; "masked indication signal" .......................................................................... 2

           C.      "includes a first mask memory location" ................................................................ 3

           D.      "control means, coupled with the network interface means, for posting status information for use by the host system as feedback for optimizing the threshold value" ............................................................................................... 4

           E.      "means, responsive to the threshold determination of the means for monitoring, for initiating transmission of the frame prior to transfer of all the data of the frame to the buffer memory from the host computer" ................ 5

                  1.      Recited Function. ......................................................................................... 5

                  2.      Corresponding Structure ............................................................................. 8

           F.      "interrupt means, coupled to the second memory location and responsive to the interrupt value from said second memory location, for generating the interrupt signal to the host" ............................................................................ 9

## TABLE OF AUTHORITIES

                                                                                                                          **Page**

**CASES**

*Cardiac Science, Inc. v. Koninklijke Philips Elecs. N.V.*,
   No.Civ. 03-1064 DWF/RLE, 2006 WL 1050629
   (D. Miss. Apr. 20, 2006) ...................................................................................................9

*Celltrace LLC v. AT&T Inc.*,
   No. 6:09cv294 LED-JDL, 2011 WL 738927
   (E.D. Tex. Feb. 23, 2011) ..............................................................................................1, 2

*Cordis Corp. v. Medtronic Ave, Inc.*,
   511 F.3d 1157 (Fed. Cir. 2008) ...........................................................................................7

*Exxon Research & Eng'g Co. v.U.S.*,
   265 F.3d 1371 (Fed. Cir. 2001) .........................................................................................10

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
   355 F.3d 1327 (Fed. Cir. 2004) ...........................................................................................8

*Iowa State Univ. Research Found., Inc. v. Wiley Organics, Inc.*,
   125 Fed. Appx. 291 (Fed. Cir. 2005) ..................................................................................6

*KopyKake Enterprises, Inc. v. Lucks Company*,
   264 F.3d 1377 (Fed. Cir. 2001) ...........................................................................................1

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*,
   324 F.3d 1308 (Fed. Cir. 2003) .......................................................................................4, 8

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
   579 F.3d 1363 (Fed. Cir. 2009) .......................................................................................1, 3

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
   133 F.3d 1473 (Fed. Cir. 1995) ...........................................................................................4

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ...........................................................................................7

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .......................................................................................3, 9

*Renishaw PLC v. Marposs Societa' per Azioni*,
   158 F.3d 1243 (Fed. Cir. 1998) ...........................................................................................2

*Superguide Corp. v. DirecTV Enters., Inc.*,
   358 F.3d 870 (Fed. Cir. 2004) .........................................................................................1, 2

**I.     TERMS IN DISPUTE**

    **A.     "network interface device"; "network interface adapter"; "network adapter"; "network adapter device"**

As used in the Patents-in-Suit, a network interface device is simply a device that interfaces between a communications network and a host system. Plain and ordinary meaning should apply.

In an obvious attempt to construct a non-infringement position, Defendants violate fundamental claim construction principles by requiring that these devices be "connectable." **Nowhere** does the claim language restrict, define, or even reference the "connectability" or "removability" of these devices. In short, **nothing** in the intrinsic record limits these devices to a "connectable" card, and the Federal Circuit has long cautioned against confining the claims to specific embodiments described in the specification.[1] Furthermore, no prior art was cited during prosecution that would require this limitation be incorporated into this construction.

With no support in the intrinsic record, Defendants rely heavily on extrinsic sources that allegedly support their position. For instance, Defendants make much of the notion that certain network interface devices were often "plugged in" to a computer at the time of the invention. Dkt. No. 121 at 9-12. But the Federal Circuit has not only stressed the primacy of the intrinsic record, but it has also repeatedly cautioned against limiting a claim construction to those early embodiments.[2] The only case relied upon by Defendants – *KopyKake Enterprises, Inc. v. Lucks Company*, 264 F.3d

---

[1] *See Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) (Even where a patent describes a single embodiment, "claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of **manifest exclusion or restriction**.") (emphasis added).

[2] The law "does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention." *Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 878-80 (Fed. Cir. 2004) (citations omitted) (finding "regularly received television signal" broad enough to encompass digital signals, even though no televisions could receive digital signals as of the filing date). This court has followed this principle. *See Celltrace LLC v. AT&T Inc.*, No. 6:09cv294 LED-JDL, 2011 WL 738927, *16 (E.D. Tex. Feb. 23, 2011) (finding "GSM-Compatible" not restricted to the GSM standard as of the filing date, but that it may include "after-arising GSM standards") (citing *SuperGuide*, 358 F.3d at 878-80).

1377 (Fed. Cir. 2001) – was distinguished by Your Honor in *Celltrace*, as well as by the Federal Circuit in *Superguide*, on the grounds that the disputed claim term was self-limiting, and expressly disclosed only the technology in existence at the time of the filing. *Superguide*, 358 F.3d at 879; *Celltrace*, 2011 WL 738927, at *16. Here, in contrast, the disputed terms are drafted broadly enough to encompass embodiments irrespective of their "connectability." Defendants also mischaracterize the prior testimony of Dr. Mitzenmacher, in which he was clearly discussing how the **infringing products** in that case – NIC cards – infringed the Patents. Dkt. No. 121, Ex. A-9 at 21. He never suggested that the Patents **only** cover NIC Cards, as Defendants appear to allege.

### B. "indication value"; "first indication signal"; "first masked signal"; "masked indication signal"

Contrary to Defendants' representations, USEI addressed only "indication value" in its Opening Brief. While USEI contends that the remaining terms are self-defining and require no further construction, USEI has nonetheless proposed separate constructions for each that properly reflect how the respective terms are defined by the intrinsic record. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("the claim construction inquiry…begins and ends in all cases with the actual words of the claim").

Each of the "indication signals" here simply indicates the occurrence of an event, the particulars of which are defined by the claims. For example, the "first indication signal" in Claim 21 is a "signal indicating one or more events detected by the network interface device." *See* '874 Patent, Claim 21 ("signals indicating events detected by the network interface device").[3] Importantly, where the indication signal happens to be located in an array of logic – whether before or after a "mask" – has no bearing on what that signal indicates.

---

[3] The "first masked signal" of Claim 23 is a "signal indicating one or more data transfer events." *See* '874 Patent, Claim 23 ("indication signals generated…in response to data transfer events"). The "masked indication signal" of Claim 29 is a "signal indicating one or more network communications events." *See* '874 Patent, Claim 29 ("indication signal…generated in response to a network communications event").

- 2 -

Defendants acknowledge that these signals represent events, but ignore the particulars of those events and instead propose a verbose construction that focuses on the elements surrounding the signals in a thinly-veiled effort to **rewrite** the claims. Substituting Defendants' **34-word** proposal for these terms would serve only to create confusion and redundancy.[4]

### C. "includes a first mask memory location"

Once again, Defendants commit the "cardinal sin" of patent law by reading a limitation from the specification into the claims that include no such limitation. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1320 (Fed. Cir. 2005) (citations omitted). The specification in no way **requires** a register be the sole embodiment, and the Federal Circuit has long cautioned against so limiting a construction. *See Martek Bioscience*, 579 F.3d at 1381 (Fed. Cir. 2009).

Defendants carelessly dismiss the patentee's express use of another type of "memory location" – the "memory cells" of claims 15 and 18. Relying on nothing more than attorney argument, Defendants claim such "cells" are only "portions or bits of a register." But claim 15 states that the "counter memory location is included in a counter memory [which] comprises a plurality of memory cells" – nowhere stating that the cells must be part of a register, as Defendants allege. Dkt. No. 121 at 17. Moreover, the very name ("memory cell") as well as the common meaning of that term,[5] reveals the patentee clearly contemplated different types of memory locations.

---

[4] For example, inserting Defendants' proposed construction into Claim 21 would re-write it as follows: "…selectively masking at least a portion of the events with a first mask to output a [*signal representing an event that is output from one level of masking and is input into a second level of masking, and that may or may not trigger generation of a corresponding interrupt signal*], said host system being coupled to receive said [*signal representing an event that is output from one level of masking and is input into a second level of masking, and that may or may not trigger generation of a corresponding interrupt signal*]; selectively masking at least a portion of the [*signal representing an event that is output from one level of masking and is input into a second level of masking, and that may or may not trigger generation of a corresponding interrupt signal*] with a second mask to output a second indication signal, said host system coupled to receive said second indication signal as an interrupt…"

[5] *See* MICROSOFT COMPUTER DICTIONARY, 5th ed. (2002), defining "memory cell" as "[a]n electronic circuit that **stores** one bit of data." (emphasis added) (Ex. B).

- 3 -

> **D.** **"control means, coupled with the network interface means, for posting status information for use by the host system as feedback for optimizing the threshold value"**

The correct function of this term is as stated in the claim: "posting status information." Under the guise of providing "guidance" on a "technical claim phrase," Defendants ignore the correct law regarding identification of the function, and propose that this term requires that the host system **actually perform** the optimization. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003) ("function may not be improperly narrowed or limited beyond the scope of the claim language"). As an initial matter, there is nothing overly "technical" about the function demanding further construction. Within the context of the '872 Patent, "posting status" is used consistently with its plain and ordinary meaning. It simply means to make the status available.[6] *See* www.merriam-webster.com (defining "post" as "to publish, announce, or advertise" or "to affix to a usual place") (Ex. A). Defendants' reliance on the fact that Judge Ware construed "optimize" is a red herring, as the plain language of the claim does not require that "optimization" actually be performed. To be clear, the phrase "for use by the host system as feedback for optimizing the threshold" simply describes the type of information that may be used for optimization.

The minimal structure necessary to perform the claimed "posting" function is simply the XMIT FAILURE register. As described throughout the specification, the XMIT FAILURE register receives status information, such as an underrun condition, and "posts" this information. '872 Patent, Col. 19:16 ("this register returns the cause of the failure"). The host can then access that register, as needed, to obtain information regarding transmission errors. '872 Patent, Col. 14:56-57

---

[6] Defendants' contend their proposal "gives effect to each [claim] feature" – but instead it **rewrites** the function to import the additional step of optimization. The plain language of the claim merely requires that information be posted **for use** in optimization. Defendants' reliance on *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1476 (Fed. Cir. 1995) is unavailing. That case simply permitted construction of a highly technical term in the chemical arts.

("[the error codes are] mapped to the XMIT FAILURE register **for host access**") (emphasis added); Col. 29:46-48 ("[underrun conditions are] made available to the host through the XMIT FAILURE register"). The host system can then use this information to alter the threshold value, if necessary. *See, e.g.,* '872 Patent, Col. 2:31-34 ("the host system [may] optimize performance using the alterable threshold store and the posted status information").

Defendants propose unnecessary structure to perform the recited "posting" function. For example, Underrun Detector 413 – as its name suggests – relates to the function of "detecting" an underrun condition, rather than the "posting" of a failure condition. Defendants also propose structure relating to the unclaimed functions of "generat[ing] [a] bad frame signal" and "coordinat[ing] transmission of the bad frame signal." Dkt. No. 121 at 18-19. But these functions relate to notifying the system **receiving** the data that a transmission error occurred – not notifying the **host**, as the claim requires.[7] This tortured interpretation necessarily invokes superfluous structure, such as "CRC logic 405," "exclusive OR gate 407," and "transmit control logic 411." '872 Patent, Fig. 18, Col. 28:41-47 (output of CRC logic 405 is supplied to transceiver for transmission on the network).

E. **"means, responsive to the threshold determination of the means for monitoring, for initiating transmission of the frame prior to transfer of all the data of the frame to the buffer memory from the host computer"**

1. Recited Function

The recited function of this term – initiating transmission – is straightforward and simply means to cause, or instruct, transmission to occur. '872 Patent, Col. 5:1-2 ("then the transmit logic 39 is instructed to begin transmission"). The claims make clear that **actual** transmission occurs later

---

[7] Not only do Defendants identify superfluous structure, but their proposed structure does not even correspond to their own proposed function of "optimizing" the threshold value. While Defendants contend that the host, using the XMIT START THRESH register, performs the optimizing function, Defendants fail to even identify these structures as part of their proposed construction.

- 5 -

as a **response** to the "initiating means" – Claim 10 goes on to recite, "network interface means [] responsive to the means for initiating, for transferring data." Furthermore, the *Acer* Court twice recognized this difference between "initiating" and "transmitting": "to 'initiate' a transmission means to cause that transmission to begin. [It] is **not** the transmission." Dkt. No. 158-9 at 20-21 (emphasis added); *see also* Dkt. No. 158-10 at 6, n.8 (finding the "initiating" task "must be completed or at least started before the transmission is begun"). Thus, the term "initiating" is used consistently with that term's plain and ordinary meaning. *See* www.merriam-webster.com (defining "initiate" as "to cause or facilitate the beginning of" or "to instruct…") (Ex. A).

In their attempt to rewrite this straightforward function to include **actual** transmission, Defendants mischaracterize the prosecution file history. To be clear, the declaration testimony cited by Defendants merely illustrates that when the inventors' embodiment of the invention actually transmitted data, the precursor step of "initiating" transmission was implicitly accomplished. Dkt. No. 121, Ex. A-7 (where co-inventor explained that "means for initiating…" is implicitly satisfied by the overlap of transmission of data and the receiving of data from the host"). The patentee made no limiting statements regarding the "initiating" function. Furthermore, the claims **as issued** express the patentee's intent to distinguish "initiating" from actual transmission. In an October 1994 amendment, the patentee amended Claim 1 to include not only the "initiating" element, but a separate "transmitting" element as well. '872 Pros. Hist., Oct. 5, 1994 Amendment (Ex. C). Defendants' attempt to force these two distinct concepts into the "initiating" means is improper, and will cause certain redundancies.

Defendants' contention that the Examiner allegedly understood the "initiating" step to be satisfied by references that performed "actual" transmission is similarly unavailing. Even if this was the case, the cited portions of the file history hardly illustrate a clear understanding by the Examiner that would have warranted a correction by the patentee, let alone a limitation of claim scope. *Iowa*

*State Univ. Research Found., Inc. v. Wiley Organics, Inc.* 125 Fed. Appx. 291, 296 (Fed. Cir. 2005) (finding examiner's statement, and patentee's "acquiescence," insufficient to limit claim scope).

Left with no intrinsic support, Defendants attempt to manufacture extrinsic support by rewriting Dr. Mitzenmacher's past trial testimony. When read properly, however, Dr. Mitzenmacher's testimony clearly supports USEI's proposal, by reciting a **sequence** of steps – initiation, followed by actual transmission: "Then we'll go ahead and initiate transmission. We'll start putting the front of the packet on the network." Dkt. No. 121, Ex. A-9 at 15. Defendants' claim that he "equated" those two steps is simply false. *Id.* at 22.

Next, Defendants attempt to import the limitation "as soon as the threshold condition is satisfied" based on an allegedly "unambiguous disclaimer" during prosecution history. As an initial matter, the claim language makes clear that transmission is initiated **in response** to the threshold determination, thus obviating the need to include this non-functional phrase into the interpretation of the recited function. Moreover, prosecution disclaimer "requires that alleged disavowing actions or statements made during prosecution be both **clear and unmistakable**," which is far from the case here. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). During prosecution, the patentee simply explained to the Examiner that the Firoozmand reference initiated transmission "only when there is a full frame available," whereas the patentee's invention initiated transmission **prior to** receipt of a full frame. Dkt. No. 121, Ex. A-21 at 6. The patentee thus simply "made explicit" what was already implicit in the patent. *See Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008) (finding no prosecution disclaimer where file history simply "served the purpose of 'inform[ing] the meaning of the claim language by demonstrating how the inventor understood the invention.'").

Defendants' attempt to insert "subject to the risk of collisions" into the recited function also fails. The portion of the file history cited by Defendants does not even relate to the claims at issue

here. Instead, the patentee was describing how the adapter "with collision sense" of Claims 24-29 differed from the prior art. The claims at issue here do not contain this phrase.[8] In sum, Defendants' tortured reading of the claimed function should be rejected, and the Court should adopt USEI's proposal which properly reflects the language of the claim.

### 2. Corresponding Structure[9]

USEI identified the correct structure required to "initiate" transmission. Specifically, a Transmit Start Signal – sent to the Transmit DMA Module – provides the requisite instruction, and the corresponding destination of that instruction, to begin transmission. *See, e.g.*, '872 Patent, Col. 4:67-5:3 ("[w]hen the threshold amount of data is resident in the buffer … transmit logic 39 **is instructed to begin transmission** of the frame").

Defendants violate Federal Circuit precedent by identifying superfluous structures. *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1334-35 (Fed. Cir. 2004). For example, Defendants attempt to incorporate the "Data Available Control block 323" and its four states into their corresponding structure. In support, Defendants contend this structure is "necessary in order to make the … structure responsive to the threshold determination…." Dkt. No. 121 at 25. This is improper. Only the language following the word "for" is the recitation of function. *See Lockheed Martin v. Space Sys./Loral, Inc.*, 324 F.3d at 1319. Here, the phrase "responsive to the threshold determination…" is non-functional, descriptive claim language that should not be forced into the corresponding structure of the "initiating" means.

---

[8] Defendants' half-hearted judicial estoppel argument also fails and represents another attempt by Defendants to improperly combine "initiating" with "transmitting." To be clear, the trial testimony cited by Defendants relates to **transmission** – not the "initiating" function recited in this claim term. For example, the Williams direct testimony clearly discusses only "elements E and F" of Claim 10 ("network interface means … for transferring data" and "control means…for posting status," respectively) – not element D, which is the "means for initiating" at issue here. Dkt. No. 121 at 24, n.27, Ex. A-9 at 24.

[9] In an effort to narrow the dispute between the parties, USEI revised its proposal to include the "Transmit DMA Module" (in addition to the Transmit Start Signal) which identifies the destination of the Transmit Start Signal. Defendants have rejected this proposed compromise without offering a counter-proposal.

- 8 -

Furthermore, to incorporate the "Data Available control block 323" would violate Federal Circuit precedent by reading limitations from the specification into the claims. *Phillips,* 415 F.3d at 1323. Put simply, the claim language makes clear that the "initiating" function only occurs once the threshold is met; but the Data Available Control block 323 relates to other, irrelevant determinations, such as a condition where **no** threshold determination is made.[10] Dkt. No. 121 at 26. This structure is therefore non-essential in performing the "initiating" function.[11]

### F. "interrupt means, coupled to the second memory location and responsive to the interrupt value from said second memory location, for generating the interrupt signal to the host"

USEI correctly identified both the function – "generating the interrupt signal to the host" – and the corresponding structure – an "interrupt controller" for this term. Defendant' allegations of indefiniteness, or for an alternative corresponding structure, fail on any number of grounds.

As an initial matter, Defendants' feigned confusion over this term is troubling when they describe their own "Interrupt Controllers" with language that mirrors what is found in the Patent:

- "The interrupt controller provides interrupt management, and is responsible for receiving [] interrupts from different sources…and delivering them to the CPU for servicing.
- "The Host Arm Interrupt Controller (AINTC) is responsible for prioritizing all [interrupt] requests from the system peripherals and **generating** [interrupts] to the host." (emphasis added).
- "The interrupt controller … receives the [interrupt] request from 60 interrupt sources. These interrupts are 'OR'ed to the interrupt controller [which then] requests [] interrupt of the [host]."
- "Interrupt management…is implemented [by] VIC [vectored interrupt controller] units, [which] **generates** two interrupt output signals to the CPU. (emphasis added).

Defendants' materials are attached hereto as Exhibit D.

---

[10] *See Cardiac Science, Inc. v. Koninklijke Philips Elecs. N.V.,* No. Civ. 03-1064 DWF/RLE, 2006 WL 1050629, at *41 (D. Miss. Apr. 20, 2006) (in construing "state detection means for determining the state of the AED," rejecting Defendants' proposed function which included specific states detected by the state detection means detected because it was "nonfunctional language and thus not properly incorporated").

[11] Defendants also contort USEI's positions and contend that the Transmit Start Signal only performs the function of instructing "other structures" to initiate transmission. This nonsensical conclusion ignores the plain language of the specification, as understood by an ordinary artisan. Dkt. No. 158-1.

Furthermore, while it is not USEI's burden, USEI provided testimony from an ordinary artisan, showing that the specification clearly links the "interrupt controller" with the function of generating interrupt signals to the host. Dkt. No. 158-1. Defendants provided **no** such evidence.

Defendants next complain that USEI has ignored the limitations "coupled to the second memory location" and "responsive to the interrupt value from said second memory location." To be clear – USEI has not **ignored** these limitations – they are simply not part of the function of the "interrupt means." These non-functional phrases simply describe how the "interrupt means" relates to other claim elements. To incorporate these phrases into the corresponding structure would not only lead to redundancies, but would necessarily invoke superfluous structure.[12]

Finally, Defendants' proposed alternative structure (which itself is evidence that this term is not indefinite) must fail. In an attempt to escape infringement, Defendants insist on a level of detail that goes far beyond that used in their own materials, by contending that the corresponding structure must include a myriad of AND gates, OR gates, and multiplexors – all of which are irrelevant to the claimed function.[13] Specifically, those components relate to how interrupts **may be** organized or prioritized before they are sent to the host. But such prioritization (if any) is not a required claim element, and is notably absent from the recited function.[14]

---

[12] Defendants' allege that USEI relied on a "single" sentence from the specification. To be clear, the specification is replete with descriptions of the interrupt controller, and its generation of interrupt signals. *See, e.g.,* '874 Patent, Col. 27:1-3 ("the following registers are used in the Interrupt Controller 60 of Fig. 4 and are used to generate interrupts…"). USEI simply identified the most straightforward example that linked the "interrupt controller" to the recited function.

[13] Defendants invite confusion by contending that the Interrupt Controller refers to "vague" enables, masks, and an ORing process. Dkt. No. 121 at 30. This unsupported attorney argument cannot support a finding of indefiniteness. *Exxon Research & Eng'g Co. v. U.S.*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (whether a term is amenable to construction is made from the standpoint of one having ordinary skill in the art). Whether the Interrupt Controller uses enables and masks, along with an ORing process (which generally relate to prioritization of signals) does not change the fact that the Interrupt Controller is still the structure responsible for "generating interrupt signals to the host."

[14] For the two remaining disputed terms – "means for comparing … and generating…" and "host interface means…" – USEI respectfully directs the Court to USEI's Opposition Brief to Defendants' Summary Judgment Motion, which is being filed today and is incorporated herein by reference.

Respectfully submitted, this 25th day of March, 2013.

ROBBINS GELLER RUDMAN
  & DOWD LLP

*/s/ Jessica M. Kattula*
John C. Herman
Ryan K. Walsh
Peter M. Jones
David L. Gann
Jessica M. Kattula
Monarch Centre, Suite 1650
3424 Peachtree Road, N.E.
Atlanta, GA 30326
(404) 504-6500 (telephone)
(404) 504-6501 (fax)
jherman@rgrdlaw.com
rwalsh@rgrdlaw.com
pjones@rgrdlaw.com
dgann@rgrdlaw.com
jkattula@rgrdlaw.com

WARD & SMITH LAW FIRM
T. John Ward, Jr.
Wesley Hill
P. O. Box 1231
Longview, Texas 75606-1231
(903) 757-6400 (telephone)
(903) 757-2323 (fax)
jw@jwfirm.com
wh@jwfirm.com

Attorneys for Plaintiff
U.S. ETHERNET INNOVATIONS, LLC

- 12 -

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

/s/ *Jessica M. Kattula*
Jessica M. Kattula