# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-235-LED-JDL |
| v. | LEAD CASE |
| | PATENT CASE |
| RICOH AMERICAS CORPORATION, | |
| Defendant. | |
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-236-LED-JDL |
| v. | CONSOLIDATED CASE |
| | PATENT CASE |
| TRENDNET, INC., | |
| Defendant. | |
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-237-LED-JDL |
| v. | CONSOLIDATED CASE |
| | PATENT CASE |
| XEROX CORPORATION, | |
| Defendant. | |
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-329-LED-JDL |
| v. | CONSOLIDATED CASE |
| | PATENT CASE |
| KONICA MINOLTA BUSINESS SOLUTIONS U.S.A., INC., et al., | |
| Defendants. | |

| | |
|---|---|
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-330-LED-JDL |
| v. | CONSOLIDATED CASE<br>PATENT CASE |
| SHARP ELECTRONICS CORPORATION, | |
| Defendant. | |

| | |
|---|---|
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-351-LED-JDL |
| v. | CONSOLIDATED CASE<br>PATENT CASE |
| DIGI INTERNATIONAL INC., et al., | |
| Defendants. | |

| | |
|---|---|
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-366-LED-JDL |
| v. | CONSOLIDATED CASE<br>PATENT CASE |
| CIRRUS LOGIC, INC., et al., | |
| Defendants. | |

| | |
|---|---|
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-399-LED-JDL |
| v. | CONSOLIDATED CASE<br>PATENT CASE |
| NETGEAR, INC., | |
| Defendant. | |

- 2 -

| | |
|---|---|
| U.S. ETHERNET INNOVATIONS, LLC,<br><br>      Plaintiff,<br><br>      v.<br><br>SAMSUNG ELECTRONICS CO., LTD., et al.,<br><br>      Defendants. | 6:12-cv-398 LED-JDL<br><br>CONSOLIDATED CASE<br>PATENT CASE |
| U.S. ETHERNET INNOVATIONS, LLC,<br><br>      Plaintiff,<br><br>      v.<br><br>STMICROELECTRONICS N.V., et al.,<br><br>      Defendants. | 6:12-cv-481-LED-JDL<br><br>CONSOLIDATED CASE<br>PATENT CASE |

## PLAINTIFF U.S. ETHERNET INNOVATIONS, LLC'S
## FIRST INTERROGATORIES (NOS. 1-10) TO DEFENDANTS

Plaintiff, U.S. Ethernet Innovations, LLC ("USEI"), by and through its undersigned attorneys and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby serves the following interrogatories upon Defendants Ricoh Americas Corporation, TRENDnet, Inc., Xerox Corporation, Konica Minolta Business Solutions U.S.A., Inc., Freescale Semiconductor, Inc., Sharp Electronics Corporation, Digi International Inc., NetSilicon, Inc., Epson America, Inc., Cirrus Logic, Inc., Yamaha Corporation of America, Control4 Corporation, Netgear, Inc., Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC, Samsung Austin Semiconductor, LLC, Oki Data Americas, Inc., STMicroelectronics N.V., and STMicroelectronics, Inc. (individually referred to herein as "Defendant"). Each interrogatory herein is to be answered fully and in writing under oath on or before the thirtieth day after service of these

780733_1

interrogatories.  In answering the interrogatories, Defendant is requested to give full and complete answers based on personal knowledge, as well as the knowledge of any agents, employees, investigators, or other persons who may have obtained information on Defendant's behalf.

## DEFINITIONS

As used herein, the terms defined below shall have the following meaning:

1.      The term "document" shall mean, in addition to its common meaning, the original and all non-identical copies of every writing or electronically stored information as defined in Rule 34 of the Federal Rules of Civil Procedure.

2.      The terms "you," "your," and "Defendant" shall include Defendant's predecessors, subsidiaries and related companies, and shall include its present and former officers, directors, agents, employees, accountants, attorneys, investigators, consultants, and representatives.

3.      The term "USEI" and "Plaintiff" shall mean Plaintiff U.S. Ethernet Innovations, LLC, its present and former officers, directors, agents, employees, and representatives.

4.      The term "'459 Patent" shall mean U.S. Patent No. 5,307,459 entitled "Network Adapter with Host Indication Optimization."

5.      The term "'872 Patent" shall mean U.S. Patent No. 5,434,872 entitled "Apparatus for Automatic Initiation of Data Transmission."

6.      The term "'094 Patent" shall mean U.S. Patent No. 5,732,094 entitled "Method for Automatic Initiation of Data Transmission."

7.      The term "'313 Patent" shall mean U.S. Patent No. 5,299,313 entitled "Network Interface with Host Independent Buffer Management."

8.      The term "'874 Patent" shall mean U.S. Patent No. 5,530,874 entitled "Network Adapter with an Indication Signal Mask and an Interrupt Signal Mask."

9.      The term "Patents-in-Suit" shall mean collectively the '459 Patent, the '872 Patent, the '094 Patent, the '313 Patent, and the '874 Patent.

10.     The term "Patent Rule 3-1 Disclosures" shall mean Plaintiff's Patent Rule 3-1 Disclosures to Defendant, and any subsequent amendment or supplementation thereto.

11.     The term "Asserted Claim" or "Asserted Claims" shall mean those claims of the Patents-in-Suit identified in Plaintiff's Patent Rule 3-1 Disclosures.

12.     The term "Accused Instrumentality" shall mean any product and/or component thereof identified in Plaintiff's Patent Rule 3-1 Disclosures as infringing, either directly or indirectly, the Patents-in-Suit.

13.     The term "Accused Product Family" shall mean any product family made, used, offered for sale, sold and/or imported by or on Defendant's behalf, which includes or formerly included an Accused Instrumentality, including by way of example, product families such as Multi-Function Systems, Copiers, Printers, IP cameras, Telecommunication Products, Servers, and/or system-on-chips.

14.     The term "Wired Network Technology" or "Wired Technology Product(s)" shall mean any device or component thereof for utilizing a wired network, including by way of example each Accused Instrumentality and component thereof, and further including without limitation "network components," whether discreet or integrated, including without limitation network adapters, network interface controllers (NIC's), Lan-on-motherboard devices (LOM's), network media access controllers (MAC's), and/or network physical layer devices (PHY's); "core-logic components," including without limitation south bridge or input-output controller devices that include, are integrated with, and/or are coupled to network components; and "network-capable devices" including but not limited to laptops, net books, desktops, workstations, portable computers,

personal computers, servers, thin clients, motherboards, printers, scanners, fax machines, phones, multi-function devices, hand-held devices, multi-media devices, image capture devices such as digital cameras, video capture devices such as video cameras, audio/video devices including televisions and home theatre systems, gaming systems, and/or entertainment systems that include, incorporate, and/or utilize the functionality incorporated in one or more network components, core-logic components, and/or network-capable devices as defined above.

15.    The term "Technical Documents" shall mean any or all of the following:

(a)    schematics;

(b)    circuit diagrams;

(c)    data sheets;

(d)    technical briefs;

(e)    simulation models;

(f)    brochures;

(g)    users' manuals, instructions, and guides;

(h)    technical specifications;

(i)    functional specifications;

(j)    engineering notes;

(k)    drawings;

(l)    reliability reports;

(m)    selection guides;

(n)    software:

(o)    firmware;

(p)    software or firmware flow charts or models;

- 6 -

(q)     source code;

(r)     bill of materials;

(s)     test reports or results;

(t)     software codes;

(u)     electronic file of the source codes;

(v)     system documents explaining the Accused Product(s) and Service(s);

(w)    operating systems and programs;

(x)     business requirements;

(y)     trouble tickets;

(z)     bug fix requests;

(aa)    product enhancement requests;

(bb)    physical data models;

(cc)    logical data models;

(dd)    release notes:

(ee)    test scripts;

(ff)    hardware configuration drawings;

(gg)    data dictionaries;

(hh)    data base schemas;

(ii)     interface diagrams;

(jj)     network diagrams; and

(kk)    installation guidelines.

16.     The terms "business entity" or "entity" shall mean firms, corporations, partnerships, joint ventures, unincorporated associations, companies, businesses, partnerships, proprietorships, or fictitious or trade names.

17.     The term "date" shall mean the precise month, day, and year, if known, or as precise a statement of the month, day, and year as is permitted by your knowledge and the documents and information available to you.

18.     The phrase "refer, reflect or relate to," with respect to any given subject, shall mean constituting, containing, embodying, evidencing, reflecting, identifying, stating, dealing with, or in any way pertinent to that subject, including without limitation documents concerning the preparation of other documents.

19.     The term "any" shall be deemed to include and encompass the words "each" and "all."  The use of the word "or" shall mean "and" as well as "or."

20.     The term "Lawsuit" shall mean the above-captioned lawsuits, *U.S. Ethernet Innovations, LLC v. Ricoh Americas Corporation*, No. 6:12-cv-235-LED; *U.S. Ethernet Innovations, LLC v. Trendnet, Inc.*, No. 6:12-cv-236-LED; *U.S. Ethernet Innovations, LLC v. Xerox Corporation*, No. 6:12-cv-237-LED; *U.S. Ethernet Innovations, LLC v. Konica Minolta Business Solutions U.S.A., Inc.*, et al., No. 6:12-cv-329-LED; *U.S. Ethernet Innovations, LLC v. Sharp Electronics Corporation*, No. 6:12-cv-330-LED; *U.S. Ethernet Innovations, LLC v. Digi International Inc., et al.*, No. 6:12-cv-351-LED; *U.S. Ethernet Innovations, LLC v. Cirrus Logic, Inc., et al.*, No. 6:12-cv-366-LED; *U.S. Ethernet Innovations, LLC v. Samsung Electronics Co., Ltd., et al.*, No. 6:12-cv-398-LED; *U.S. Ethernet Innovations, LLC v. Netgear, Inc.*, No. 6:12-cv-399-LED; and *U.S. Ethernet Innovations, LLC v. STMicroelectronics N.V., et al.*, No. 6:12-cv-481-LED.

21.     The term "Realtek Litigation" shall mean *3Com Corp. v. D-Link Systems, Inc. and Realtek Semiconductor Corp.*, N.D. Cal., Case No. 3:03-cv-2177.

22.     The term "Answer" shall mean Defendant's Answer to USEI's Complaint in this Lawsuit, filed or yet to be filed in the above-styled action, and any subsequent amendments thereto.

23.     The term "facts" shall mean all facts, details or information of any type acquired by Defendant, by any means.

24.     The term "communications" shall mean any and all written communications between two or more persons contained in any documents, or oral communications including, but not limited to, telephone communications, personal conferences or meetings between two or more persons.

25.     The term "prior art" means that information or knowledge that is accessible to a person of ordinary skill in the art, including that which would be obvious from such information or knowledge, in accordance with 35 U.S.C. §§ 102 and 103.

26.     The term "knowledge" shall mean information derived from any source, including hearsay knowledge.

27.     The terms "identify," "identified," or "identity," when used in reference to:

(a)     an individual, shall mean to state the individual's full name, present or last known (designating which) address and telephone number, and present or last known (designating which) business affiliation, job title, and employment address;

(b)     a business entity, shall mean to state the entity's full name, present or last known (designating which) address and telephone number, a brief description of the general nature of its business, the address of its principal place of business, the state or country of incorporation (if any), and the identity of the officer or other person having knowledge of the matter with respect to which the business entity has been identified;

- 9 -

(c)       documents, shall mean to state the bates number or other identifying number (if any), the title (if any), the date, author, sender, preparer, recipient, the identity of the persons signing it, the type of document (i.e., a letter, memorandum, book, telegraph, facsimile, chart, etc.) or some better means of identifying it, a summary of its contents, and its present location or custodian;

(d)       communications, shall mean to state the parties to the communication, the date the communication was made and whether the communication was written or oral; and

(e)       products, shall mean to state the product's model number and product family.

## INSTRUCTIONS

1.       Your obligation to respond to these interrogatories shall be continuing to the full extent permitted under the applicable rules.

2.       If you contend that you are entitled on the basis of any claim of privilege to withhold any information or document in response to these interrogatories, provide the following information with respect to such information:

(a)       For each document, item, or information, identify the author or authors, all actual and intended recipients, the date the document, item, or information was created, and a description of the document, item, or information;

(b)       State the basis of the grounds for the claim of privilege;

(c)       Identify the person on whose behalf the claim of privilege is being asserted;

(d)       State the subject matter of the information or document sought to be withheld; and

(e)       Specify the interrogatories to which the information or document is responsive.

- 10 -

3.      These interrogatories seek information that is within Defendant's possession, custody, or control.  To the extent that Defendant is aware of information or documents responsive to these interrogatories that is in the possession of any business entity affiliated with Defendant, the general subject matter of that information, the identity of the documents and the identity of the business affiliate with direct knowledge of the information or possession of the documents are deemed to be within Defendant's possession, custody, or control and responsive to these interrogatories.

4.      With regard to the terms defined herein, all terms used in the singular shall include the plural, and all terms used in the plural shall include the singular.

5.      Except for reference to defined or designated terms, each interrogatory shall be construed independently and not by reference to any other request herein for purposes of limitation.

6.      Whenever a date is requested, the exact date is to be given unless it is not known; and in that case, the approximate date should be given or the best estimate thereof; and the answer should state that the date provided is an estimate or approximation.

7.      When facts set forth in your answers are supplied upon information and belief rather than based on your direct personal knowledge, you should so state and specifically identify each source of such information and belief.  Should you be unable to answer any interrogatory or portion thereof by either actual knowledge or upon information and belief, you should so state.

## INTERROGATORIES

INTERROGATORY NO. 1:

State in detail the factual and legal bases for each and every defense asserted in Defendant's Answer to the Complaint.

INTERROGATORY NO. 2:

Identify any and all Wired Technology Products made, used, offered for sale, sold and/or imported into this country, by, for and/or on Defendant's behalf since January 1, 2005.

- 11 -

INTERROGATORY NO. 3:

Identify any and all products made, used, offered for sale, sold and/or imported into this country, by, for and/or on Defendant's behalf since January 1, 2005 that are or were included in any Accused Product Family.

INTERROGATORY NO. 4:

For each product and/or service identified in response to Interrogatory Nos. 2 and 3, identify each and every one of Defendant's past and present customers.

INTERROGATORY NO. 5:

For each product and/or service identified in response to Interrogatory Nos. 2 and 3, state the number of units sold for each year since January 1, 2005, identify all costs and expenses incurred by Defendant in connection with each product and/or service identified, and state Defendant's net and gross revenue derived from each of the products or services identified.

INTERROGATORY NO. 6:

Identify every person who had any direct, material involvement in the design and/or development of each product and/or service identified in response to Interrogatory Nos. 2 and 3, and specify the three (3) persons whom you believe are most knowledgeable regarding the design, manufacture, and sale of each product and/or service.

INTERROGATORY NO. 7:

To the extent that Defendant contends that any Technical Documents (as defined herein) regarding any product and/or service identified in response to Interrogatory Nos. 2 and 3, including without limitation the documents required for production under Patent Rule 3-4(a), are not within the possession, custody, or control of Defendant, identify for each such product the entity in possession, custody, or control of such Technical Documents and the nature of these Technical Documents.

INTERROGATORY NO. 8:

Identify and describe in detail any marketing plans, revenue projections, market analyses, or sales forecasts for any of the products and/or services identified in response to Interrogatory Nos. 2 and 3.

INTERROGATORY NO. 9:

Identify and describe in detail the circumstances by which Defendant first became aware of each of the Patents-in-Suit.

INTERROGATORY NO. 10:

For each Asserted Claim and for each Accused Instrumentality and/or component thereof, state in chart form responsive to the chart(s) attached to Plaintiff's Patent Rule 3-1 Disclosures to Defendant, as to each identified element in each Asserted Claim, whether such element is present literally or under the doctrine of equivalents in each Accused Instrumentality and, if not, the reason for such denial and the relevant distinctions.

Dated: October 19, 2012        ROBBINS GELLER RUDMAN
                                                      & DOWD LLP

                                           */s/ David L. Gann*
                                           John C. Herman
                                           Ryan K. Walsh
                                           Peter M. Jones
                                           David L. Gann
                                           Monarch Centre, Suite 1650
                                           3424 Peachtree Road, N.E.
                                           Atlanta, GA 30326
                                           (404) 504-6500 (telephone)
                                           (404) 504-6501 (fax)
                                           jherman@rgrdlaw.com
                                           rwalsh@rgrdlaw.com
                                           pjones@rgrdlaw.com
                                           dgann@rgrdlaw.com

and

WARD & SMITH LAW FIRM
T. John Ward, Jr.
Wesley Hill
P. O. Box 1231
1127 Judson Rd., Ste. 220
Longview, Texas 75606-1231
(903) 757-6400 (telephone)
(903) 757-2323 (fax)
jw@jwfirm.com
wh@jwfirm.com

ATTORNEYS FOR PLAINTIFF
U.S. ETHERNET INNOVATIONS, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 19, 2012, I served the foregoing **PLAINTIFF U.S. ETHERNET INNOVATIONS, LLC'S FIRST INTERROGATORIES (NOS. 1-10) TO DEFENDANTS** on all counsel of record for each Defendant via Electronic Mail.


*/s/ David L. Gann*
David L. Gann

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-235-LED-JDL |
| v. | LEAD CASE<br>PATENT CASE |
| RICOH AMERICAS CORPORATION, | |
| Defendant. | |
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-236-LED-JDL |
| v. | CONSOLIDATED CASE<br>PATENT CASE |
| TRENDNET, INC., | |
| Defendant. | |
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-237-LED-JDL |
| v. | CONSOLIDATED CASE<br>PATENT CASE |
| XEROX CORPORATION, | |
| Defendant. | |
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-329-LED-JDL |
| v. | CONSOLIDATED CASE<br>PATENT CASE |
| KONICA MINOLTA BUSINESS SOLUTIONS U.S.A., INC., et al., | |
| Defendants. | |

| | |
|---|---|
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-330-LED-JDL |
| v. | CONSOLIDATED CASE PATENT CASE |
| SHARP ELECTRONICS CORPORATION, | |
| Defendant. | |
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-351-LED-JDL |
| v. | CONSOLIDATED CASE PATENT CASE |
| DIGI INTERNATIONAL INC., et al., | |
| Defendants. | |
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-366-LED-JDL |
| v. | CONSOLIDATED CASE PATENT CASE |
| CIRRUS LOGIC, INC., et al., | |
| Defendants. | |
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-399-LED-JDL |
| v. | CONSOLIDATED CASE PATENT CASE |
| NETGEAR, INC., | |
| Defendant. | |

| | |
|---|---|
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-398 LED-JDL |
| v. | CONSOLIDATED CASE PATENT CASE |
| SAMSUNG ELECTRONICS CO., LTD., et al., | |
| Defendants. | |
| U.S. ETHERNET INNOVATIONS, LLC, | |
| Plaintiff, | 6:12-cv-481-LED-JDL |
| v. | CONSOLIDATED CASE PATENT CASE |
| STMICROELECTRONICS N.V., et al., | |
| Defendants. | |

**PLAINTIFF U.S. ETHERNET INNOVATIONS, LLC'S
SECOND INTERROGATORIES (NOS. 11-16) TO
DEFENDANT OKI DATA AMERICAS, INC.**

Plaintiff, U.S. Ethernet Innovations, LLC ("USEI"), by and through its undersigned attorneys and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby serves the following interrogatories upon Defendant Oki Data Americas, Inc. ("Defendant"). Each interrogatory herein is to be answered fully and in writing under oath on or before the thirtieth day after service of these interrogatories. In answering the interrogatories, Defendant is requested to give full and complete answers based on personal knowledge, as well as the knowledge of any agents, employees, investigators, or other persons who may have obtained information on Defendant's behalf.

**DEFINITIONS**

As used herein, the terms defined below shall have the following meaning:

1.      The term "document" shall mean, in addition to its common meaning, the original and all non-identical copies of every writing or electronically stored information as defined in Rule 34 of the Federal Rules of Civil Procedure.

2.      The terms "you," "your," and "Defendant" shall include Defendant's predecessors, subsidiaries and related companies, and shall include its present and former officers, directors, agents, employees, accountants, attorneys, investigators, consultants, and representatives.

3.      The term "USEI" and "Plaintiff" shall mean Plaintiff U.S. Ethernet Innovations, LLC, its present and former officers, directors, agents, employees, and representatives.

4.      The term "'459 Patent" shall mean U.S. Patent No. 5,307,459 entitled "Network Adapter with Host Indication Optimization."

5.      The term "'872 Patent" shall mean U.S. Patent No. 5,434,872 entitled "Apparatus for Automatic Initiation of Data Transmission."

6.      The term "'094 Patent" shall mean U.S. Patent No. 5,732,094 entitled "Method for Automatic Initiation of Data Transmission."

7.      The term "'313 Patent" shall mean U.S. Patent No. 5,299,313 entitled "Network Interface with Host Independent Buffer Management."

8.      The term "'874 Patent" shall mean U.S. Patent No. 5,530,874 entitled "Network Adapter with an Indication Signal Mask and an Interrupt Signal Mask."

9.      The term "Patents-in-Suit" shall mean collectively the '459 Patent, the '872 Patent, the '094 Patent, the '313 Patent, and the '874 Patent.

10.     The term "Patent Rule 3-1 Disclosures" shall mean Plaintiff's Patent Rule 3-1 Disclosures to Defendant, and any subsequent amendment or supplementation thereto.

11.     The term "Asserted Claim" or "Asserted Claims" shall mean those claims of the Patents-in-Suit identified in Plaintiff's Patent Rule 3-1 Disclosures.

12.     The term "Accused Instrumentality" shall mean any product and/or component thereof identified in Plaintiff's Patent Rule 3-1 Disclosures as infringing, either directly or indirectly, the Patents-in-Suit.

13.     The term "Accused Product Family" shall mean any product family made, used, offered for sale, sold and/or imported by or on Defendant's behalf, which includes or formerly included an Accused Instrumentality, including by way of example, product families such as Multi-Function Systems, Copiers, Printers, IP cameras, Telecommunication Products, Servers, and/or system-on-chips.

14.     The term "Wired Network Technology" or "Wired Technology Product(s)" shall mean any device or component thereof for utilizing a wired network, including by way of example each Accused Instrumentality and component thereof, and further including without limitation "Network Components," whether discreet or integrated, including without limitation network adapters, network interface controllers (NIC's), Lan-on-motherboard devices (LOM's), network media access controllers (MAC's), and/or network physical layer devices (PHY's); "Core-Logic Components," including without limitation south bridge or input-output controller devices that include, are integrated with, and/or are coupled to Network Components; and "Network-Capable Devices" including but not limited to laptops, net books, desktops, workstations, portable computers, personal computers, servers, thin clients, motherboards, printers, scanners, fax machines, phones, multi-function devices, hand-held devices, multi-media devices, image capture devices such as digital cameras, video capture devices such as video cameras, audio/video devices including televisions and home theatre systems, gaming systems, and/or entertainment systems that include,

- 5 -

incorporate, and/or utilize the functionality incorporated in one or more Network Components, Core-Logic Components, and/or Network-Capable Devices as defined above.

15.     The term "Ethernet Component" shall mean Network Components and Core Logic Components as defined in Wired Network Technology above.

16.     The term "Memory Component" shall mean data storage circuitry and/or devices, including without limitation, RAM, SDRAM, DDR RAM, flash memory, and/or hard drives, for example.

17.     The term "Processor Component" shall mean processing unit, including without limitation processors, microprocessors, microcontrollers, and/or system-on-chips, for example.

18.     The term "OEM Product" shall mean end-user products, equipment, or devices, including without limitation, products such as printers, copiers, scanners, fax machines, multi-function systems, telecommunication systems, IP phones, IP cameras, servers, routers, modems, gateways, televisions, home theater systems, audio systems, media controllers, and home automation systems, for example, including Network Capable Devices as defined above.

19.     The term "Technical Documents" shall mean any or all of the following:

        (a)     schematics;

        (b)     circuit diagrams;

        (c)     data sheets;

        (d)     technical briefs;

        (e)     simulation models;

        (f)     brochures;

        (g)     users' manuals, instructions, and guides;

        (h)     technical specifications;

(i)     functional specifications;

(j)     engineering notes;

(k)     drawings;

(l)     reliability reports;

(m)     selection guides;

(n)     software:

(o)     firmware;

(p)     software or firmware flow charts or models;

(q)     source code;

(r)     bill of materials;

(s)     test reports or results;

(t)     software codes;

(u)     electronic file of the source codes;

(v)     system documents explaining the Accused Product(s) and Service(s);

(w)     operating systems and programs;

(x)     business requirements;

(y)     trouble tickets;

(z)     bug fix requests;

(aa)     product enhancement requests;

(bb)     physical data models;

(cc)     logical data models;

(dd)     release notes:

(ee)     test scripts;

(ff)   hardware configuration drawings;

(gg)   data dictionaries;

(hh)   data base schemas;

(ii)   interface diagrams;

(jj)   network diagrams; and

(kk)   installation guidelines.

20.   The terms "business entity" or "entity" shall mean firms, corporations, partnerships, joint ventures, unincorporated associations, companies, businesses, partnerships, proprietorships, or fictitious or trade names.

21.   The term "date" shall mean the precise month, day, and year, if known, or as precise a statement of the month, day, and year as is permitted by your knowledge and the documents and information available to you.

22.   The phrase "refer, reflect or relate to," with respect to any given subject, shall mean constituting, containing, embodying, evidencing, reflecting, identifying, stating, dealing with, or in any way pertinent to that subject, including without limitation documents concerning the preparation of other documents.

23.   The term "any" shall be deemed to include and encompass the words "each" and "all."  The use of the word "or" shall mean "and" as well as "or."

24.   The term "Lawsuit" shall mean the above-captioned lawsuits, *U.S. Ethernet Innovations, LLC v. Ricoh Americas Corporation*, No. 6:12-cv-235-LED-JDL; *U.S. Ethernet Innovations, LLC v. Trendnet, Inc.*, No. 6:12-cv-236-LED-JDL; *U.S. Ethernet Innovations, LLC v. Xerox Corporation*, No. 6:12-cv-237-LED-JDL; *U.S. Ethernet Innovations, LLC v. Konica Minolta Business Solutions U.S.A., Inc.*, et al., No. 6:12-cv-329-LED-JDL; *U.S. Ethernet Innovations, LLC*

*v. Sharp Electronics Corporation*, No. 6:12-cv-330-LED-JDL; *U.S. Ethernet Innovations, LLC v. Digi International Inc., et al.*, No. 6:12-cv-351-LED-JDL; *U.S. Ethernet Innovations, LLC v. Cirrus Logic, Inc., et al.*, No. 6:12-cv-366-LED-JDL; *U.S. Ethernet Innovations, LLC v. Samsung Electronics Co., Ltd., et al.*, No. 6:12-cv-398-LED-JDL; *U.S. Ethernet Innovations, LLC v. Netgear, Inc.*, No. 6:12-cv-399-LED-JDL; and *U.S. Ethernet Innovations, LLC v. STMicroelectronics N.V., et al.*, No. 6:12-cv-481-LED-JDL.

25.     The term "Realtek Litigation" shall mean *3Com Corp. v. D-Link Systems, Inc. and Realtek Semiconductor Corp.*, N.D. Cal., Case No. 3:03-cv-2177.

26.     The term "Acer Litigation" shall mean *U.S. Ethernet Innovations, LLC v. Acer Inc., et al.,* N.D. Cal., Case No. 3:10-cv-03724-MMC; *U.S. Ethernet Innovations, LLC v. AT&T Mobility, LLC, et al.*, N.D. Cal., Case No. 3:10-cv-05254-MMC; and *Zions Bancorporation v. U.S. Ethernet Innovations, LLC*, N.D. Cal., Case No. 3:10-cv-03481-MMC.

27.     The term "Answer" shall mean Defendant's Answer to USEI's Complaint in this Lawsuit, filed or yet to be filed in the above-styled action, and any subsequent amendments thereto.

28.     The term "facts" shall mean all facts, details or information of any type acquired by Defendant, by any means.

29.     The term "communications" shall mean any and all written communications between two or more persons contained in any documents, or oral communications including, but not limited to, telephone communications, personal conferences or meetings between two or more persons.

30.     The term "prior art" means that information or knowledge that is accessible to a person of ordinary skill in the art, including that which would be obvious from such information or knowledge, in accordance with 35 U.S.C. §§ 102 and 103.

31.     The term "knowledge" shall mean information derived from any source, including hearsay knowledge.

32.     The terms "identify," "identified," or "identity," when used in reference to:

(a)     an individual, shall mean to state the individual's full name, present or last known (designating which) address and telephone number, and present or last known (designating which) business affiliation, job title, and employment address;

(b)     a business entity, shall mean to state the entity's full name, present or last known (designating which) address and telephone number, a brief description of the general nature of its business, the address of its principal place of business, the state or country of incorporation (if any), and the identity of the officer or other person having knowledge of the matter with respect to which the business entity has been identified;

(c)     documents, shall mean to state the bates number or other identifying number (if any), the title (if any), the date, author, sender, preparer, recipient, the identity of the persons signing it, the type of document (i.e., a letter, memorandum, book, telegraph, facsimile, chart, etc.) or some better means of identifying it, a summary of its contents, and its present location or custodian;

(d)     communications, shall mean to state the parties to the communication, the date the communication was made and whether the communication was written or oral;

(e)     products, shall mean to state the product's model number and product family; and

(f)     component, shall mean to state the component's model number, and the component's manufacturer, exporter, importer, and/or distributor.

- 10 -

## INSTRUCTIONS

1.      Your obligation to respond to these interrogatories shall be continuing to the full extent permitted under the applicable rules.

2.      If you contend that you are entitled on the basis of any claim of privilege to withhold any information or document in response to these interrogatories, provide the following information with respect to such information:

(a)     For each document, item, or information, identify the author or authors, all actual and intended recipients, the date the document, item, or information was created, and a description of the document, item, or information;

(b)     State the basis of the grounds for the claim of privilege;

(c)     Identify the person on whose behalf the claim of privilege is being asserted;

(d)     State the subject matter of the information or document sought to be withheld; and

(e)     Specify the interrogatories to which the information or document is responsive.

3.      These interrogatories seek information that is within Defendant's possession, custody, or control.  To the extent that Defendant is aware of information or documents responsive to these interrogatories that is in the possession of any business entity affiliated with Defendant, the general subject matter of that information, the identity of the documents and the identity of the business affiliate with direct knowledge of the information or possession of the documents are deemed to be within Defendant's possession, custody, or control and responsive to these interrogatories.

4.      With regard to the terms defined herein, all terms used in the singular shall include the plural, and all terms used in the plural shall include the singular.

5.      Except for reference to defined or designated terms, each interrogatory shall be construed independently and not by reference to any other request herein for purposes of limitation.

6.      Whenever a date is requested, the exact date is to be given unless it is not known; and in that case, the approximate date should be given or the best estimate thereof; and the answer should state that the date provided is an estimate or approximation.

7.      When facts set forth in your answers are supplied upon information and belief rather than based on your direct personal knowledge, you should so state and specifically identify each source of such information and belief.  Should you be unable to answer any interrogatory or portion thereof by either actual knowledge or upon information and belief, you should so state.

### INTERROGATORIES

INTERROGATORY NO. 11:

Identify and describe in detail all licenses and prospective licenses negotiated, even if not yet consummated, and licenses considered relating to each product and/or service identified in response to Interrogatory Nos. 2 and 3.

INTERROGATORY NO. 12:

Identify all persons who were contacted and who provided information and/or documents for the purpose of responding to Plaintiff's interrogatories or for the purpose of collecting and/or producing documents pursuant to the Court's Discovery Order in this Lawsuit.

INTERROGATORY NO. 13:

Identify any and all communications or correspondence you have had with any person or entity with regard to Plaintiff; Parallel Technology, LLC; the Patents-in-Suit; any of the named inventors of the Patents-in-Suit; the Realtek Litigation; or the Acer Litigation.

INTERROGATORY NO. 14:

For each product identified in response to Interrogatory No. 2, identify each Ethernet Component functionally integrated therein, whether by default or by option.

INTERROGATORY NO. 15:

For each product identified in response to Interrogatory No. 2, identify each Memory Component functionally integrated therein, whether by default or by option.

INTERROGATORY NO. 16:

For each OEM Product made, used, offered for sale, sold and/or imported into this country, by, for and/or on Defendant's behalf since January 1, 2005, including without limitation those identified in response to Interrogatory Nos. 2 and 3, identify each Processor Component functionally integrated therein, whether by default or by option.


Dated: October 24, 2012          ROBBINS GELLER RUDMAN
                                     & DOWD LLP


                                 /s/ David L. Gann
                                 John C. Herman
                                 Ryan K. Walsh
                                 Peter M. Jones
                                 David L. Gann
                                 Monarch Centre, Suite 1650
                                 3424 Peachtree Road, N.E.
                                 Atlanta, GA 30326
                                 (404) 504-6500 (telephone)
                                 (404) 504-6501 (fax)
                                 jherman@rgrdlaw.com
                                 rwalsh@rgrdlaw.com
                                 pjones@rgrdlaw.com
                                 dgann@rgrdlaw.com

and

WARD & SMITH LAW FIRM
T. John Ward, Jr.
Wesley Hill
P. O. Box 1231
1127 Judson Rd., Ste. 220
Longview, Texas 75606-1231
(903) 757-6400 (telephone)
(903) 757-2323 (fax)
jw@jwfirm.com
wh@jwfirm.com

ATTORNEYS FOR PLAINTIFF
U.S. ETHERNET INNOVATIONS, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 24, 2012, I served the foregoing **PLAINTIFF U.S.
ETHERNET INNOVATIONS, LLC'S SECOND INTERROGATORIES (NOS. 11-16) TO
DEFENDANT OKI DATA AMERICAS, INC.** on all counsel of record for each Defendant via
Electronic Mail.


*/s/ David L. Gann*
David L. Gann

# EXHIBIT 3

| | |
|---|---|
| **From:** | Jessica Kattula <JKattula@rgrdlaw.com> |
| **Sent:** | Wednesday, April 10, 2013 1:45 PM |
| **To:** | Alan D. Albright; Amanda A. Abraham; Andrew Russell; Anupam Sharma; Benjamin G. Damstedt; Benjamin L. Bernell; Brendan C. Roth; Carl R. Roth; Charles E. Phipps; Christine S. Yun Sauer; Cole M. Fauver; Cono A. Carrano; Conor M. Civins; Dan D. Davison; Deanna L. Kwong; Deron Dacus; Eric Charles Wood; Eric Findlay; Evan Finkel; Hamad Hamad; Hyun S. Byun; Iftikhar Ahmed; James Chang; James Isbester; James Robert Arnett, II; Jan-Feng Lee; Jeff Castellano; Jeffrey Walker; Jennifer Klein Ayers; Jennifer Parker Ainsworth; Jin-Suk Park; Jordan Trent Jones; Kenneth Tanji, Jr.; Marc R. Labgold; Matthew J. Hertko; Melissa Richards Smith; Melvin Wilcox; Michael Charles Smith; Michael Chibib; Michael D. Karson; Michael J. Bettinger; Michael V. Solomita; Nitin Subhedar; Patrick J. Hoeffner; Paul R. Steadman; Ranganath Sudarshan; Richard S. Zembek; Rickey L. Faulkner; Ricoh Defendants; Robert Greeson; Robert T. Haslam; Roger Brian Craft; Romeao J. Jennings; Ruben H. Munoz; Sara Giardina; Stephanie O`Byrne; Stephen M. Everett; Steven G. Schortgen; Timothy S. Teter; W. Scott Hastings |
| **Cc:** | John Herman; Ryan Walsh; Peter Jones; David Gann; 'Johnny Ward'; Wesley Hill; Gail Armstrong |
| **Subject:** | USEI - Request for Meet-and-Confer April 11 or 12 |

Counsel:

We write regarding the deficient discovery responses provided to date in this case.  Specifically, we would like to have a meet and confer with you tomorrow afternoon (April 11) or Friday (April 12), with lead and local counsel present to address the following deficiencies:

(1)  Defendants' refusal to identify "reasonably similar" likely infringing products;
(2)  Defendants' failure to produce relevant technical and financial information on the accused and reasonably similar products; and
(3)  Defendants' refusal to provide its non-infringement positions.

While there may additional issues we need to take up on a defendant-by-defendant basis, we believe that at least one of these issues applies to every defendant.

We are happy to do these meet and confers individually or collectively.   Please let us know if there is a time tomorrow or Friday that works.

Regards,
Jessica

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

# EXHIBIT 4



Andrew E. Russell
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0704
arussell@shawkeller.com

April 8, 2013

**BY FED EX & E-MAIL (W/OUT ENCLOSURE)**

Jessica M. Kattula
ROBBINS GELLER RUDMAN
& DOWD LLP
3424 Peachtree Road, N.E.
Monarch Centre, Suite 1650
Atlanta, GA 30326
(404) 504-6500
jkattula@rgrdlaw.com

Re:   *U.S. Ethernet Innovations, LLC v. Samsung Electronics Co., Ltd., et al.,*
      C.A. No. 6:12-398-MHS-JDL

Dear Jessica:

Please find enclosed a disc containing Oki Data Americas, Inc.'s document production bates numbered OKIUSEI0006956 through OKIUSEI020372.

Some documents are marked confidential or highly confidential - outside counsel only. Please treat them as such under the protective order in this action. Please let us know if you have any trouble accessing the documents.

Sincerely,

*/s/ Andrew E. Russell*

Andrew E. Russell

Enclosure

cc:   (by e-mail w/out enclosure)
      John C. Herman
      Ryan K. Walsh
      Peter M. Jones
      David L. Gann
      T. John Ward, Jr.
      Wesley Hill



## 799472743588

| Ship (P/U) date : | | Actual delivery : |
|---|---|---|
| **Mon 4/08/2013 7:17 pm** | **Delivered** | **Wed 4/10/2013 9:51 am** |
| WILMINGTON, DE  US | Signed for by: D.DEBOOTH | ATLANTA, GA  US |

### Travel History

| ▲Date/Time | Activity | Location |
|---|---|---|
| ▾ 4/10/2013  -  Wednesday | | |
| 9:51 am | Delivered | ATLANTA, GA |
| 8:39 am | On FedEx vehicle for delivery | MARIETTA, GA |
| 8:02 am | At local FedEx facility | MARIETTA, GA |
| 6:01 am | At destination sort facility | ATLANTA, GA |
| 4:11 am | Departed FedEx location | MEMPHIS, TN |
| ▾ 4/09/2013  -  Tuesday | | |
| 9:38 am | Arrived at FedEx location | MEMPHIS, TN |
| ▾ 4/08/2013  -  Monday | | |
| 9:15 pm | Left FedEx origin facility | NEW CASTLE, DE |
| 7:17 pm | Picked up | NEW CASTLE, DE |
| 4:30 pm | Shipment information sent to FedEx | |

Local Scan Time

### Shipment Facts

| Tracking number | 799472743588 | Service | FedEx Express Saver |
|---|---|---|---|
| Weight | 0.5 lbs | Delivered To | Receptionist/Front Desk |
| Total pieces | 1 | Total shipment weight | 0.5 lbs / 0.2 kgs |
| Shipper reference | 10003.04 | Packaging | FedEx Envelope |
| Special handling section | Deliver Weekday | | |

# EXHIBIT 5

| | |
|---|---|
| **From:** | Patrick J. Hoeffner <phoeffner@labgoldlaw.com> |
| **Sent:** | Friday, April 12, 2013 10:34 AM |
| **To:** | 'Peter Jones' |
| **Cc:** | 'Jessica Kattula'; 'Wesley Hill'; 'John Herman'; 'Ryan Walsh'; 'David Gann'; 'Gail Armstrong' |
| **Subject:** | USEI/Oki Data - Motion to Compel |

Counsel,

USEI's recently-filed motion to compel fails to comply with Local Rule CV-7(h) which requires the parties to meet and confer prior to a discovery related motion being filed. The telephone call nearly two months ago fails to satisfy the meet and confer requirement for at least two reasons. First, Oki Data supplemented its production on April 8 and is currently preparing supplemental interrogatory answers. This includes supplementing Oki Data's responses citing Rule 33(d). Second, Oki Data's position on Interrogatory number 1, for example, which asks for details regarding the defenses in Oki Data's Answer, was that Oki Data had not yet served an Answer, so it was impossible to respond. Since the February 15 call, however, Oki Data has served an Answer and we are currently preparing a supplemental interrogatory response. USEI's motion to compel fails to account for either of these developments. These deficiencies would have been avoided had the meet and confer occurred in a timely manner. Accordingly, the motion should be withdrawn and proper motion practice procedure should be followed.

Please let us know by close of business Friday (4/12) whether USEI will withdraw the motion and engage in a meet and confer to discuss the current status of discovery and outstanding discovery issues, if any.

Regards,
Patrick

**Patrick J. Hoeffner, Esq.**
**Marc R. Labgold, P.C.**
**12007 Sunrise Valley Drive**
**Suite 110**
**Reston, VA 20191**

**Tel: 516-984-8542**
**Fax: 877-401-8855**
**phoeffner@labgoldlaw.com**

# EXHIBIT 6

**From:** Jessica Kattula [mailto:JKattula@rgrdlaw.com]
**Sent:** Friday, April 12, 2013 12:09 PM
**To:** 'Patrick J. Hoeffner'; Peter Jones
**Cc:** 'Wesley Hill'; John Herman; Ryan Walsh; David Gann; Gail Armstrong
**Subject:** RE: USEI/Oki Data - Motion to Compel

Patrick,

The parties met and conferred on February 15, 2013.  At that meet and confer, Oki Data's counsel confirmed for the second time that Oki Data stood by its objections and did not intend to supplement its Interrogatory responses.  Since that time, Oki Data provided **no** supplementation to its Interrogatory responses, which is the subject of USEI's motion to compel.  Therefore, USEI's motion to compel is proper.

While Oki Data produced additional documents earlier this week, that production did not remedy any of the deficiencies in Oki Data's interrogatory responses.  Further, Oki Data filed its Answer on April 1, 2013, and could have supplemented its response to Interrogatory No. 1 at that time.  It did not.  The fact that Oki Data now claims to be "preparing supplemental interrogatory answers" only after USEI filed its motion regarding Oki Data's blatantly deficient responses does not somehow render USEI's motion improper.

USEI will not withdraw its motion at this time.  Of course, once Oki Data provides the supplementation you referenced below, we will certainly consider it.  If that supplementation fully remedies any of Oki Data's deficiencies, we are amenable to withdrawing those issues from our motion to compel.

Can you please provide a date certain by which Oki intends to supplement, and a specific identification of which interrogatories it intends to supplement?

Regards,
Jessica

**From:** Patrick J. Hoeffner [mailto:phoeffner@labgoldlaw.com]
**Sent:** Friday, April 12, 2013 10:34 AM
**To:** Peter Jones
**Cc:** Jessica Kattula; 'Wesley Hill'; John Herman; Ryan Walsh; David Gann; Gail Armstrong
**Subject:** USEI/Oki Data - Motion to Compel

Counsel,

USEI's recently-filed motion to compel fails to comply with Local Rule CV-7(h) which requires the parties to meet and confer prior to a discovery related motion being filed. The telephone call nearly two months ago fails to satisfy the meet and confer requirement for at least two reasons. First, Oki Data supplemented its production on April 8 and is currently preparing supplemental interrogatory answers. This includes supplementing Oki Data's responses citing Rule 33(d).

Second, Oki Data's position on Interrogatory number 1, for example, which asks for details regarding the defenses in Oki Data's Answer, was that Oki Data had not yet served an Answer, so it was impossible to respond. Since the February 15 call, however, Oki Data has served an Answer and we are currently preparing a supplemental interrogatory response. USEI's motion to compel fails to account for either of these developments. These deficiencies would have been avoided had the meet and confer occurred in a timely manner. Accordingly, the motion should be withdrawn and proper motion practice procedure should be followed.

Please let us know by close of business Friday (4/12) whether USEI will withdraw the motion and engage in a meet and confer to discuss the current status of discovery and outstanding discovery issues, if any.

Regards,
Patrick

**Patrick J. Hoeffner, Esq.**
**Marc R. Labgold, P.C.**
**12007 Sunrise Valley Drive**
**Suite 110**
**Reston, VA 20191**

**Tel: 516-984-8542**
**Fax: 877-401-8855**
**phoeffner@labgoldlaw.com**

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

# EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| U.S. Ethernet Innovations, LLC, | ) | |
| | ) | Civil Action File |
| Plaintiff, | ) | |
| | ) | No. 6:12-cv-398-LED |
| v. | ) | |
| | ) | |
| Samsung Electronics Co., Ltd.; Samsung | ) | |
| Electronics America, Inc.; Samsung | ) | |
| Telecommunications America, LLC; Samsung | ) | |
| Austin Semiconductor, LLC; and Oki Data | ) | |
| Americas, Inc., | ) | |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |

## PLAINTIFF U.S. ETHERNET INNOVATIONS, LLC'S PATENT RULE 3-1 DISCLOSURE TO DEFENDANT OKI DATA AMERICAS, INC.

Pursuant to P.R. 3-1 of the Rules of Practice for Patent Cases before the United States District Court for the Eastern District of Texas, Plaintiff U.S. Ethernet Innovations, LLC ("USEI") makes the following Disclosure of Asserted Claims and Infringement Contentions to Defendant Oki Data Americas, Inc. ("Defendant" or "Oki Data").

As discovery in this action has yet to begin and because the claims of the patents-in-suit have not yet been construed by the Court, Plaintiff USEI makes these preliminary disclosures based on the information available to it to date. Pursuant to the Federal Rules of Civil Procedure and the Rules of Practice for Patent Cases, USEI therefore reserves its rights to supplement, amend, and/or modify these Disclosures as the full extent of Oki Data's infringement becomes known, after the claims of the patents are construed by the Court, or after the case becomes more fully developed over the course of discovery.

761027_1

RP001

## I.    P.R. 3-1 DISCLOSURE OF ASSERTED CLAIMS AND INFRINGEMENT CONTENTIONS

### A.    Asserted Claims

USEI alleges that Oki Data infringes at least claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 19, 20, 21, 22, 23, 24, 25, 26, 28, 30, 31, 32, 33, 34, 35, 37, 39, 40, 41, 43, 44, 45, and 46  of United States Patent No. 5,732,094 (the "'094 Patent"), at least claims 1, 3, 4, 5, 6, 10, 15, 16, 17, 21, 23, 24, 25, and 26 of United States Patent No. 5,434,872 (the "'872 Patent"), at least claims 1, 2, 3, 4, 6, 8, 9, 21, 22, 23, 24, 25, 26, 27, 29, and 30 of United States Patent No. 5,530,874 (the "'874 Patent"), and at least claims 1, 3, 5, 7, 9, and 10 of United States Patent No. 5,299,313 (the "'313 Patent") (collectively the "Asserted Patents" and the "Asserted Claims").

These contentions of Asserted Claims are, at this stage in the proceedings, necessarily limited in the sense that USEI has had limited access to information concerning the structure and function of Oki Data's accused products and services.  USEI therefore reserves the right to supplement these contentions as it obtains additional information concerning Oki Data's accused products and/or services over the course of discovery.

Oki Data infringes each of the Asserted Claims under 35 U.S.C. § 271(a), (b), and (c).

### B.    Accused Instrumentalities

Subject to the foregoing reservations, and based on information presently known to USEI, USEI believes that at least the following Oki Data products, services, and/or methods infringe one or more of the Asserted Claims.  USEI expressly reserves the right to add or remove products as discovery continues.

Oki Data's printer products, including without limitation: OKIPOS 407II point of service printers, ML320, ML321, ML390, ML391, ML420, ML421, ML490, ML491, ML520, ML521,

761027_1

**RP002**

ML590, ML591 Microline network printers, compatible devices and variants thereof, and

products incorporating similar technology.

### C.    Claim Charts

Claim charts identifying where each element of each Asserted Claim of the '094 Patent is

found within the Accused Instrumentalities are attached hereto as Attachment A.  Claim charts

identifying where each element of each Asserted Claim of the '872 Patent is found within the

Accused Instrumentalities are attached hereto as Attachment B.  Claim charts identifying where

each element of each Asserted Claim of the '874 Patent is found within the Accused

Instrumentalities are attached hereto as Attachment C.  Claim charts identifying where each

element of each Asserted Claim of the '313 Patent is found within the Accused Instrumentalities

are attached hereto as Attachment D.  The documents referenced in the claim charts are included

herewith.

USEI further contends that Oki Data's distributors and customers committed acts of

direct infringement of the Asserted Patents through their use, offers for sale, and/or sale of these

Accused Instrumentalities.  USEI alleges that Oki Data indirectly infringed, including

contributing to and inducing the infringement of, the Asserted Patents through its importation of,

offer for sale and sale of the Accused Instrumentalities to these distributors and/or customers.

### D.    Doctrine of Equivalents

Oki Data has infringed each of the Asserted Claims literally and under the doctrine of

equivalents. To the extent that any differences are alleged to exist between the Asserted Claims

and the Accused Instrumentalities, such differences are insubstantial. Oki Data's products and/or

methods perform substantially the same function, in substantially the same way, to yield

761027_1

**RP003**

substantially the same result. Therefore, Oki Data infringes the Asserted Claims both literally and under the doctrine of equivalents.

### E.     Priority Dates

The '872 Patent claims priority to Application No. 07/920,893 filed on July 28, 1992. The file history for this Application No. 07/920,893 contains a declaration under 37 C.F.R. §1.131 in which the inventors declare that the subject matter of the Application was conceived prior to May 29, 1990.  Therefore, the priority date of the '872 Patent is at least as early as May 29, 1990.  USEI reserves the right to pursue discovery on this issue once discovery is open and to supplement this disclosure as necessary.

The '094 Patent claims priority to Application No. 07/920,893 filed on July 28, 1992. The file history for this Application No. 07/920,893 contains a declaration under 37 C.F.R. §1.131 in which the inventors declare that the subject matter of the Application was conceived prior to May 29, 1990.  Therefore, the priority date of the '872 Patent is at least as early as May 29, 1990.  USEI reserves the right to pursue discovery on this issue once discovery is open and to supplement this disclosure as necessary.

The '874 Patent claims priority to Application No. 08/012,561 filed on February 2, 1993. On information and belief, the priority date for the '874 Patent is at least as early as May 29, 1990.  In the alternative, the priority date is February 2, 1993.  USEI reserves the right to pursue discovery on this issue once discovery is open and to supplement this disclosure as necessary.

The '313 Patent claims priority to Application No. 07/921,519 filed on July 28, 1992.  On information and belief, the priority date for the '313 Patent is at least as early as May 29, 1990. In the alternative, the priority date is July 28, 1992.  USEI reserves the right to pursue discovery on this issue once such discovery is and to supplement this disclosure as necessary.

4

RP004

**F.      Practice of the Claimed Inventions**

While USEI does not practice the Asserted Claims, its predecessor in interest, 3Com

Corporation, practiced these inventions as 3Com was a world-wide leader in Ethernet products

until it was forced out of the business and forced to lay-off approximately 4,000 employees as a

result of Oki Data's, amongst others, infringement of the Asserted Patents.


Dated: October 5, 2012                ROBBINS GELLER RUDMAN
                                         & DOWD LLP

                                      /s/ *David L. Gann*
                                      John C. Herman
                                      Ryan K. Walsh
                                      Peter M. Jones
                                      David L. Gann
                                      3424 Peachtree Street, N.E.
                                      Monarch Centre, Suite 1650
                                      Atlanta, Georgia 30326
                                      (404) 504-6500 (telephone)
                                      (404) 504-6501 (facsimile)
                                      jherman@rgrdlaw.com
                                      rwalsh@rgrdlaw.com
                                      pjones@rgrdlaw.com
                                      dgann@rgrdlaw.com

                                      and
                                      WARD & SMITH LAW FIRM
                                      T. John Ward, Jr.
                                      (State Bar No. 00794818)
                                      Wesley Hill
                                      (State Bar No. 24032294)
                                      P.O. Box 1231
                                      1127 Judson Road, Ste. 220
                                      Longview, Texas 75606-1231
                                      (903) 757-6400 (telephone)
                                      (903) 757-2323 (facsimile)
                                      jw@wsfirm.com
                                      wh@wsfirm.com

                                      Attorneys for Plaintiff
                                      U.S. Ethernet Innovations, LLC

761027_1

**RP005**

# ATTACHMENT A
## '094 Patent Claim Charts

RP006

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**

| Claim 1 | Accused Instrumentalities |
|---|---|
| A method for transmitting a frame of data from a host system through a network interface device to a network, comprising: | The Accused Instrumentalities perform every step of claim 1 literally and under the doctrine of equivalents.  Specifically, the Accused Instrumentalities include the OKI Data printer products, including without limitation the OKI Microline network printers, including the  ML320, ML321, ML390, ML391, ML420, ML421, ML490, ML491, ML520, ML521, ML590, ML591, compatible devices and variants thereof, and products incorporating similar technology ("hereinafter the "OKI Printer Products"), used to transmit a frame of data from a host system (OKI Printer Products, hereinafter "Host System") through a network interface device to a network as recited in claim 1, such as when transmitting an Ethernet frame on an LAN.  |

1

RP007

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**

## ML320/321 Turbo/n: for workgroups or small businesses

The OKI Printing Solutions answer for true remote management is the ML320/321 Turbo/n. It comes with a high-speed OkiLAN® 6120e 10/100 Base-T Internal Print Server— pre-installed and ready to perform—so that all of the printer's advantages can be enjoyed across your company network and accessed by users via the Internet.

### Emulations, Interface and Memory
- **Emulation:** Epson FX, IBM PPR III, (DEC®) ANSI x 3.64[2] and OKI MICROLINE
- **Interface:** Standard: IEEE Parallel; USB; Optional: RS-232C Serial; Ethernet via OkiLAN 6120e 10/100 Base-T Internal Print Server standard on ML320T/n and ML321T/n[3], OkiLAN® 6020e+ 10/100 Base-T External Print Server; Co-ax Adapter or Twin-ax/-Co-ax (3rd party)
- **Memory:** Total RAM: 64K   Receive Buffer: 28K

*OKI Microline 320/321 Turbo Series Brochure,* page 2.

2

RP008

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**



*Samsung S3C4510B 32-bit Microcontroller Manual* (herinafter "*Microcontroller Manual*"), page 7-2.

| | |
|---|---|
| executing a frame transfer task initiated in the host system to transfer a frame to a buffer memory in the network interface device; and | A frame transfer task is executed in the Accused Instrumentalities to transfer a frame (Ethernet frame) to a buffer memory (including without limitation a transmit FIFO, hereinafter the "Buffer Memory") in the network interface device. |

RP009

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**

| | |
|---|---|
| | **BUFFERED DMA INTERFACE (BDI)**<br><br>The buffered DMA interface (BDI) supports read and write operations across the system bus. Two eight-bit buses transfer data with optional parity checking. The system interface initiates data transfers. The MAC-layer controller responds with a ready signal to accept data for transmission, or to deliver data which has been received. An end-of-frame signal indicates the boundary between packets.<br><br>*Microcontroller Manual*, page 7-6.<br><br>**THE MAC TRANSMIT BLOCK**<br><br>The MAC transmit block is responsible for transmitting data. It complies with the IEEE802.3 standard for carrier sense multiple access with collision detection (CSMA/CD) protocol. The MAC transmit block consists of the following sections:<br><br>— Transmit FIFO and controllers<br>— Preamble and jam generators<br>— Pad generator<br>— Parallel CRC generator<br>— Threshold logic and counters<br>— Back-off and retransmit timers<br>— Transmit state machine |

4

RP010

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**



*Microcontroller Manual*, page 7-3.

RP011

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**

| | |
|---|---|
| | **Transmit FIFO and Read/Write Controllers**<br><br>The transmit FIFO has an 80-byte depth. An extra bit is associated with each data byte for parity checking. This 80-byte by 9-bit size allows the first 64 bytes of a data packet to be stored and retransmitted, without further system involvement, in case of a collision. If no collision occurs and transmission is underway, the additional 16 bytes handle system latency and avoid FIFO under-run.<br><br>When the system interface has set the transmit enable bit in the appropriate control register, the transmit state machine requests data from the BDI. The system controller then fetches data from the system memory.<br><br>The FIFO controller stores data in the transmit FIFO until the threshold for transmit data is satisfied. The FIFO controller passes a handshaking signal to the transmit state machine, indicating that sufficient data is in the FIFO to start the transmit operation. If the FIFO is not full, the FIFO controller issues a request to the BDI for more data. The transmit state machine continues transmitting data until it detects the end-of-frame signal, which signals the last byte. It then appends the calculated CRC to the end of the data (unless the CRC truncate bit in the transmit control register is set). The packet transmit bit in the status register is set, generating an interrupt if it is enabled.<br><br>*Microcontroller Manual*, page 7-8. |
| executing a frame transmission task in the network interface device to initiate transmission of the frame from the buffer memory to the network in parallel with the frame transfer task before the frame is completely transferred to the buffer memory. | A frame transmission task is executed in the Accused Instrumentalities to initiate transmission of the frame from the buffer memory (Buffer Memory) to the network in parallel with the frame transfer task before the frame is completely transferred to the buffer memory (Accused Instrumentalities start frame transmission to the network when the Transmit Threshold amount of data has been written to the transmit FIFO).<br><br>**Transmit FIFO and Read/Write Controllers**<br><br>The transmit FIFO has an 80-byte depth. An extra bit is associated with each data byte for parity checking. This 80-byte by 9-bit size allows the first 64 bytes of a data packet to be stored and retransmitted, without further system involvement, in case of a collision. If no collision occurs and transmission is underway, the additional 16 bytes handle system latency and avoid FIFO under-run.<br><br>When the system interface has set the transmit enable bit in the appropriate control register, the transmit state machine requests data from the BDI. The system controller then fetches data from the system memory.<br><br>The FIFO controller stores data in the transmit FIFO until the threshold for transmit data is satisfied. The FIFO controller passes a handshaking signal to the transmit state machine, indicating that sufficient data is in the FIFO to start the transmit operation. If the FIFO is not full, the FIFO controller issues a request to the BDI for more data. The transmit state machine continues transmitting data until it detects the end-of-frame signal, which signals the last byte. It then appends the calculated CRC to the end of the data (unless the CRC truncate bit in the transmit control register is set). The packet transmit bit in the status register is set, generating an interrupt if it is enabled. |

RP012

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**

| | |
|---|---|
| | *Microcontroller Manual*, page 7-8. |
| | **Threshold Logic and Counters** |
| | The transmit state machine uses a counter and logic to control the threshold of when transmission can begin. before it attempts to initiate transmission, the MAC waits until eight bytes or a complete packet has been placed in the transmit FIFO. This gives the DMA engine some latency without causing an underflow during transmission. |
| | *Microcontroller Manual*, page 7-9. |
| **Claim 2** | |
| The method of claim 1, wherein the frame transmission task includes executing a carrier sense, multiple access protocol. | The Accused Instrumentalities perform the method of claim 1, wherein the frame transmission task includes executing a carrier sense, multiple access protocol (Accused Instrumentalities transmit on an Ethernet network). |
| | **THE MAC TRANSMIT BLOCK** |
| | The MAC transmit block is responsible for transmitting data. It complies with the IEEE802.3 standard for carrier sense multiple access with collision detection (CSMA/CD) protocol. The MAC transmit block consists of the following sections: |
| | *Microcontroller Manual*, page 7-7. |
| **Claim 3** | |
| The method of claim 1, wherein the frame transmission task includes executing a carrier sense, multiple access with collision detection protocol. | The Accused Instrumentalities perform the method of claim 1, wherein the frame transmission task includes executing a carrier sense, multiple access with collision detection protocol (Accused Instrumentalities transmit on an Ethernet network). |
| | **THE MAC TRANSMIT BLOCK** |
| | The MAC transmit block is responsible for transmitting data. It complies with the IEEE802.3 standard for carrier sense multiple access with collision detection (CSMA/CD) protocol. The MAC transmit block consists of the following sections: |
| | *Microcontroller Manual*, page 7-7. |

RP013

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**

| Claim 4 | |
|---|---|
| The method as in claim 1, further comprising: | The Accused Instrumentalities perform the method of claim 1, further comprising: |
| detecting an underrun condition in which the transfer of the data of the frame into the buffer memory falls behind the transmission of the data from the buffer memory to the network; and | The Accused Instrumentalities detect an underrun condition in which the transfer of the data of the frame (Ethernet frame) into the buffer memory (Buffer Memory) falls behind the transmission of the data from the buffer memory to the network.<br><br>**Reporting of Transmission Errors**<br>A transmit operation terminates when the entire packet (preamble, SFD, data, and CRC) has been successfully transmitted through the MII without a collision. In addition, the transmit block detects and reports both internal and network errors.<br><br>Transmit FIFO underrun   The 80-byte transmit FIFO can handle a system latency of 6.4bi (640 bit times). An underrun of the transmit FIFO during transmission indicates a system problem (namely, that the system cannot keep up with the demands of the MAC), and the transmission is aborted.<br><br>Microcontroller Manual, page 7-60. |
| supplying a bad frame signal to the network in response to the underrun condition. | The Accused Instrumentalities supply a bad frame signal (omitted or bad CRC, for example) to the network in response to the underrun condition (Accused Instrumentalities abort the transmit operation when an underrun is detected and omit the CRC).<br><br>**Reporting of Transmission Errors**<br>A transmit operation terminates when the entire packet (preamble, SFD, data, and CRC) has been successfully transmitted through the MII without a collision. In addition, the transmit block detects and reports both internal and network errors.<br><br>Transmit FIFO underrun   The 80-byte transmit FIFO can handle a system latency of 6.4bi (640 bit times). An underrun of the transmit FIFO during transmission indicates a system problem (namely, that the system cannot keep up with the demands of the MAC), and the transmission is aborted.<br><br>Microcontroller Manual, page 7-60. |

RP014

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**

| | | |
|---|---|---|
| | Transmit block | Moves the outgoing data from the transmit buffer to the MII. The transmit block includes circuits for generating the CRC, checking parity, and generating preamble or jam. The transmit block also has timers for back-off after collision and for the interframe gap the follows a transmission. |

*Microcontroller Manual, page 7-4.*

**Transmit FIFO and Read/Write Controllers**

The transmit FIFO has an 80-byte depth. An extra bit is associated with each data byte for parity checking. This 80-byte by 9-bit size allows the first 64 bytes of a data packet to be stored and retransmitted, without further system involvement, in case of a collision. If no collision occurs and transmission is underway, the additional 16 bytes handle system latency and avoid FIFO under-run.

When the system interface has set the transmit enable bit in the appropriate control register, the transmit state machine requests data from the BDI. The system controller then fetches data from the system memory.

The FIFO controller stores data in the transmit FIFO until the threshold for transmit data is satisfied. The FIFO controller passes a handshaking signal to the transmit state machine, indicating that sufficient data is in the FIFO to start the transmit operation. If the FIFO is not full, the FIFO controller issues a request to the BDI for more data. The transmit state machine continues transmitting data until it detects the end-of-frame signal, which signals the last byte. It then appends the calculated CRC to the end of the data (unless the CRC truncate bit in the transmit control register is set). The packet transmit bit in the status register is set, generating an interrupt if it is enabled.

*Microcontroller Manual, page 7-8.*

| Claim 5 | |
|---|---|
| The method as in claim 1, wherein the frame transmission task includes: | The Accused Instrumentalities perform the method of claim 1, wherein the frame transmission task includes: |
| appending an error detection code to the frame of data to be transmitted to the network. | The Accused Instrumentalities append an error detection code (CRC may be added to end of packet) to the frame of data to be transmitted to the network. |

RP015

OKI Data – Printer Products
USEI Claim Chart for U.S.P.N. 5,732,094

|  | Table 7-23. MAC Transmit Control Register Description | | |
|  | Bit Number | Bit Name | Description |
|  | [0] | Transmit enable (TxEn) | Set this bit to enable transmission. To stop transmission immediately, clear the transmit enable bit to "0". |
|  | [1] | Transmit halt request (TxHalt) | Set this bit to halt transmission after completing any current packet. |
|  | [2] | Suppress padding (NoPad) | Set to not generate pad bytes for packets of less than 64 bytes. |
|  | [3] | Suppress CRC (NoCRC) | Set to suppress addition of a CRC at the end of a packet. |

Microcontroller Manual, page 7-37.

**Transmit FIFO and Read/Write Controllers**

The transmit FIFO has an 80-byte depth. An extra bit is associated with each data byte for parity checking. This 80-byte by 9-bit size allows the first 64 bytes of a data packet to be stored and retransmitted, without further system involvement, in case of a collision. If no collision occurs and transmission is underway, the additional 16 bytes handle system latency and avoid FIFO under-run.

When the system interface has set the transmit enable bit in the appropriate control register, the transmit state machine requests data from the BDI. The system controller then fetches data from the system memory.

The FIFO controller stores data in the transmit FIFO until the threshold for transmit data is satisfied. The FIFO controller passes a handshaking signal to the transmit state machine, indicating that sufficient data is in the FIFO to start the transmit operation. If the FIFO is not full, the FIFO controller issues a request to the BDI for more data. The transmit state machine continues transmitting data until it detects the end-of-frame signal, which signals the last byte. It then appends the calculated CRC to the end of the data (unless the CRC truncate bit in the transmit control register is set). The packet transmit bit in the status register is set, generating an interrupt if it is enabled.

Microcontroller Manual, page 7-8.

| **Claim 6** | |
| The method as in claim 5, further comprising: | The Accused Instrumentalities perform the method of claim 5, further comprising: |
| detecting an underrun condition in which the transfer of the data of the frame into the buffer memory falls behind the transmission of the data from the buffer memory to the network transceiver; and | The Accused Instrumentalities detect an underrun condition in which the transfer of the data of the frame (Ethernet frame) into the buffer memory (Buffer Memory) falls behind the transmission of the data from the buffer memory to the network transceiver (PHY). |

RP016

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**

<table>
<tr><td></td><td>

**Reporting of Transmission Errors**

A transmit operation terminates when the entire packet (preamble, SFD, data, and CRC) has been successfully transmitted through the MII without a collision. In addition, the transmit block detects and reports both internal and network errors.

| Transmit FIFO underrun | The 80-byte transmit FIFO can handle a system latency of 6.4bi (640 bit times). An underrun of the transmit FIFO during transmission indicates a system problem (namely, that the system cannot keep up with the demands of the MAC), and the transmission is aborted. |

Microcontroller Manual, page 7-60.

</td></tr>
<tr><td>

corrupting the error detection code in response to the underrun condition.

</td><td>

The Accused Instrumentalities corrupt the error detection code (CRC, for example) in response to the underrun condition (Accused Instrumentalities abort the transmit operation when an underrun is detected, appending a bad CRC).

| Transmit block | Moves the outgoing data from the transmit buffer to the MII. The transmit block includes circuits for generating the CRC, checking parity, and generating preamble or jam. The transmit block also has timers for back-off after collision and for the interframe gap the follows a transmission. |

Microcontroller Manual, page 7-4.

**Transmit FIFO and Read/Write Controllers**

The transmit FIFO has an 80-byte depth. An extra bit is associated with each data byte for parity checking. This 80-byte by 9-bit size allows the first 64 bytes of a data packet to be stored and retransmitted, without further system involvement, in case of a collision. If no collision occurs and transmission is underway, the additional 16 bytes handle system latency and avoid FIFO under-run.

When the system interface has set the transmit enable bit in the appropriate control register, the transmit state machine requests data from the BDI. The system controller then fetches data from the system memory.

The FIFO controller stores data in the transmit FIFO until the threshold for transmit data is satisfied. The FIFO controller passes a handshaking signal to the transmit state machine, indicating that sufficient data is in the FIFO to start the transmit operation. If the FIFO is not full, the FIFO controller issues a request to the BDI for more data. The transmit state machine continues transmitting data until it detects the end-of-frame signal, which signals the last byte. It then appends the calculated CRC to the end of the data (unless the CRC truncate bit in the transmit control register is set). The packet transmit bit in the status register is set, generating an interrupt if it is enabled.

</td></tr>
</table>

RP017

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**

| | Microcontroller Manual, page 7-8. |
|---|---|
| **Claim 7** | |
| The method as in claim 1, including making a threshold determination based on a comparison of a count of data transferred into the buffer memory with a threshold value. | The Accused Instrumentalities perform the method of claim 1, including making a threshold determination based on a comparison of a count of data transferred into the buffer memory with a threshold value (Accused Instrumentalities initiate transmission when the "threshold for transmit data is satisfied"). <br><br> **Transmit FIFO and Read/Write Controllers** <br><br> The transmit FIFO has an 80-byte depth. An extra bit is associated with each data byte for parity checking. This 80-byte by 9-bit size allows the first 64 bytes of a data packet to be stored and retransmitted, without further system involvement, in case of a collision. If no collision occurs and transmission is underway, the additional 16 bytes handle system latency and avoid FIFO under-run. <br><br> When the system interface has set the transmit enable bit in the appropriate control register, the transmit state machine requests data from the BDI. The system controller then fetches data from the system memory. <br><br> The FIFO controller stores data in the transmit FIFO until the threshold for transmit data is satisfied. The FIFO controller passes a handshaking signal to the transmit state machine, indicating that sufficient data is in the FIFO to start the transmit operation. If the FIFO is not full, the FIFO controller issues a request to the BDI for more data. The transmit state machine continues transmitting data until it detects the end-of-frame signal, which signals the last byte. It then appends the calculated CRC to the end of the data (unless the CRC truncate bit in the transmit control register is set). The packet transmit bit in the status register is set, generating an interrupt if it is enabled. <br><br> Microcontroller Manual, page 7-8. <br><br> **Threshold Logic and Counters** <br><br> The transmit state machine uses a counter and logic to control the threshold of when transmission can begin. before it attempts to initiate transmission, the MAC waits until eight bytes or a complete packet has been placed in the transmit FIFO. This gives the DMA engine some latency without causing an underflow during transmission. <br><br> Microcontroller Manual, page 7-9. |
| **Claim 8** | |
| The method as in claim 7, further comprising: | The Accused Instrumentalities perform the method as in claim 7, further comprising: |
| providing access to the threshold value so | The Accused Instrumentalities provide access to the threshold value (BDMA transmit |

RP018

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**

| Claim 1 | Accused Instrumentalities |
|---|---|
| A method for transmitting a frame of data from a host system through a network interface device to a network, comprising: | The Accused Instrumentalities perform every step of claim 1 literally and under the doctrine of equivalents.  Specifically, the Accused Instrumentalities include the OKI Data printer products, including without limitation the OKIPOS 407II point of service printer, compatible devices and variants thereof, and products incorporating similar technology ("hereinafter the "OKI Printer Products"), used to transmit a frame of data from a host system (OKI Printer Products, hereinafter "Host System") through a network interface device to a network as recited in claim 1, such as when transmitting an Ethernet frame on an LAN.<br><br> |

RP019

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**

| Specifications | | |
|---|---|---|
| Technology | Print Method | Direct thermal |
| | Print Speed | Up to 250 mm/sec[1] (48 RPM)[1] |
| | Printing Width | Max 3.15" (80 mm) |
| | Dot Density | 203 dpi (8 dots/mm) |
| Interface | Standard | RS232 serial; IEEE 1284 bidirectional; USB; Ethernet |

*OKIPOS 407II Point-of-Service Printer Brochure,* page 2.



*NS7520 Microprocessor Hardware Reference*, September 2007 (hereinafter "Net+ARM Manual"), page 154.[1]

---

[1] Plaintiff contends that processors in the NET+ARM family operate similarly for the purposes of infringement when functionally integrated with the OKI Printer Products. Plaintiff provides references to NS7520 for exemplary purposes.

2

RP020

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**

| | |
|---|---|
| executing a frame transfer task initiated in the host system to transfer a frame to a buffer memory in the network interface device; and | A frame transfer task is executed in the Accused Instrumentalities to transfer a frame (Ethernet frame) to a buffer memory (including without limitation a transmit FIFO, hereinafter the "Buffer Memory") in the network interface device.<br><br>**Transmit and receive FIFOs**<br><br>The EFE contains a 512-byte transmit FIFO and a 2048-byte local receive FIFO (storing filtered packets):<br><br>■ **Transmit FIFO.** Allows the critical portion of the transmit buffer to wait in the FIFO while collisions occur on the Ethernet medium. This scheme removes the need for the transmitter to fetch the buffer multiple times from memory.<br><br>**EFE transmit processing**<br><br>The NS7520 Ethernet transmit DMA channel addresses one list of buffer descriptors per packet to be transmitted. The Ethernet transmit DMA channel moves Ethernet packets corresponding to this buffer descriptor list to the local FIFO in the EFE module.<br><br>*NS7520 Microprocessor Hardware Reference*, September 2007 (hereinafter "Net+ARM Manual"), page 151. |

3

RP021

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**



*Figure 21: Ethernet front-end module*

Net+ARM Manual, page 150.

RP022

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**



*Figure 23: MAC block diagram*

Net+ARM Manual, page 155.

| executing a frame transmission task in the network interface device to initiate transmission of the frame from the buffer memory to the network in parallel with the frame transfer task before the frame is completely transferred to the buffer memory. | A frame transmission task is executed in the Accused Instrumentalities to initiate transmission of the frame from the buffer memory (Buffer Memory) to the network in parallel with the frame transfer task before the frame is completely transferred to the buffer memory (Accused Instrumentalities start frame transmission when the Transmit FIFO byte count equals the Transmit FIFO watermark). |
|---|---|

RP023

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**

| | |
|---|---|
| | **Ethernet FIFO Data register**<br><br>**Address: FF80 0008 / FF80 000C (secondary address)**<br>The Ethernet FIFO Data register allows manual interface with the Ethernet FIFO, rather than using DMA support. This register is used primarily as a diagnostic tool.<br><br>*Writing to the Ethernet FIFO Data register*<br><br>Writing to the Ethernet FIFO Data register loads the transmit FIFO. This register can be written only when the TXREGE bit is set in the Ethernet General Status register, indicating that space is available in the transmit FIFO.<br><br>The transmit FIFO has a secondary address (FF80 000C) that signifies the last word of a transmit frame. The first and middle words must use the primary address (FF80 0008).<br><br>Writing to the secondary address with the transmit interrupts disabled (ETXBC in the Ethernet General Control register) initiates transmission of data from the transmit FIFO. Otherwise, transmission begins when the TX FIFO byte count equals the selected watermark (ETXWM in the Ethernet General Control register).<br><br>Net+ARM Manual, page 167. |

| D21:20 | R/W | ETXWM | 0 | **Transmit FIFO water mark before transmit start** |
|---|---|---|---|---|
| | | | | 00    25% FIFO full |
| | | | | 01    50% FIFO full |
| | | | | 10    75% FIFO full |
| | | | | 11    Reserved |
| | | | | Identifies the minimum number of bytes required in the transmit FIFO to initiate packet transmission. A larger watermark setting increases transmit packet latency, allowing for more slack in the memory system FIFO fill rate. |
| | | | | Note that packet transmission can also be initiated using DMA (see "Ethernet transmitter considerations" on page 145) and the FIFO Data register (see "Ethernet FIFO Data register" on page 167). |

Net+ARM Manual, page 160.

**6**

RP024

**OKI Data – Printer Products**
**USEI Claim Chart for U.S.P.N. 5,732,094**



Figure 23: MAC block diagram

Net+ARM Manual, page 155.

| Claim 2 | |
|---|---|
| The method of claim 1, wherein the frame transmission task includes executing a carrier sense, multiple access protocol. | The Accused Instrumentalities perform the method of claim 1, wherein the frame transmission task includes executing a carrier sense, multiple access protocol (Accused Instrumentalities transmit on an Ethernet network). |

RP025

# EXHIBIT 8

Friday, September 9, 2005

1

PENTAX

```
 1              THE UNITED STATES DISTRICT COURT

 2            IN AND FOR THE DISTRICT OF DELAWARE

 3                         - - -

 4   HONEYWELL INTERNATIONAL, INC.    :     CIVIL ACTIONS
     et al.                          :
 5                                    :
                    Plaintiffs,      :
 6                                    :
              v.                      :
 7                                    :
     AUDIOVOX COMMUNICATIONS CORP.,   :
 8   et al.                          :
                                      :    NO. 04-1337 (KAJ)
 9              Defendants.          .:
     --------------------------------
10   HONEYWELL INTERNATIONAL, INC.    :
     et al.                          :
11                                    :
                    Plaintiffs,      :
12                                    :
              v.                      :
13                                    :
     APPLE COMPUTER, INC.,  et al.,   :
14                                    :    NO. 04-1338 (KAJ)
                Defendants.
15                         - - -

16                  Wilmington, Delaware
            Friday, September 9, 2005 at 10:40 a.m.
17                 TELEPHONE CONFERENCE

18                         - - -

19   BEFORE:      HONORABLE KENT A. JORDAN, U.S.D.C.J.

20                         - - -

     APPEARANCES:
21

22       ASHBY & GEDDES
         BY:  STEVEN J. BALICK, ESQ.
23
                   and
24

25                            Brian P. Gaffigan
                              Registered Merit Reporter
```

SHEET 2

2

```
 1   APPEARANCES: (Continued)

 2

 3        MORRIS NICHOLS ARSHT & TUNNELL
          BY:  THOMAS C. GRIMM, ESQ.,

 4

 5             and

 6        ROBINS KAPLAN MILLER & CIRESI, L.L.P
          BY:  MARTIN R. LUECK, ESQ.,
 7             MATTHEW L. WOODS, ESQ., and
               STACIE E. OBERTS, ESQ.
 8             (Minneapolis, Minnesota)

 9             and

10        HONEYWELL INTERNATIONAL
          BY:  J. DAVID BRAMAN, ESQ.
11
                    Counsel on behalf of Honeywell
12                  International, Inc., and Honeywell
                    Intellectual Properties, Inc.
13
          SMITH KATZENSTEIN & FURLOW
14        BY:  ROBERT J. KATZENSTEIN, ESQ.

15             and

16        HOGAN & HARTSON, LLP
          BY:  ROBERT J. BENSON, ESQ.
17             (Los Angeles, California)

18                  Counsel for Seiko Epson Corp.,
                    Kyocera Wireless Corp.
19
          YOUNG CONAWAY STARGATT & TAYLOR
20        BY:  JOHN W. SHAW, ESQ.

21                  Counsel for Olympus Corporation,
                    Olympus America, Inc., Sony Corporation,
22                  And Sony Corporation of America

23             . and

24

25
```

3

```
 1   APPEARANCES: (Continued)

 2

 3        KENYON & KENYON
          BY:  ROBERT L. HAILS, ESQ.
 4             (Washington, District of Columbia)

 5             and

 6        KENYON & KENYON
          BY:  JOHN FLOCK, ESQ.
 7             (New York, New York)

 8                  Counsel for Sony Corporation, and Sony
                    Corporation of America
 9
               and
10
          KENYON & KENYON
11        BY:  RICHARD M. ROSATI, ESQ.
               (New York, New York)
12
                    Counsel for Olympus Corporation, and
13                  Olympus America, Inc.

14        RICHARDS LAYTON & FINGER
          BY:  WILLIAM J. WADE, ESQ.
15
               and
16
          WEIL GOTSHAL & MANGES
17        BY:  STEPHEN J. RIZZI, ESQ.
               (New York, New York)
18
                    Counsel for Matsushita Electrical
19                  Industrial Co. And Matsushita
                    Electical Corporation of America
20

21

22

23

24

25
```

4

```
 1   APPEARANCES:  (Continued)

 2

 3        FISH & RICHARDSON, P.C.
          BY:  THOMAS L. HALKOWSKI, ESQ.

 4                  Counsel for Nokia, Inc., Casio, Inc., Casio
 5                  Computer and Apple Computer Inc.

 6             and

 7        FISH & RICHARDSON, P.C.
          BY:  JOHN T. JOHNSON, ESQ., and
 8             LEWIS E. HUDNELL, III, ESQ.
               (New York, New York)

 9                  Counsel for Casio, Inc., Casio Computer
10
               and
11
          FISH & RICHARDSON, P.C.
          BY:  KELLY C. HUNSAKER, ESQ.
12             (Redwood City, California)

13                  Counsel for Apple Computer Inc.

14             and

15        FISH & RICHARDSON, P.C.
          BY:  LAUREN A. DEGNAN, ESQ.
16             (Washington, District of Columbia)

17                  Counsel for Nokia, Inc.

18
          RICHARDS LAYTON & FINGER
19        BY:  CHAD M. SHANDLER, ESQ.

20             and

21        HARRIS BEACH, LLP
          BY:  NEAL L. SLIFKIN, ESQ.
22             (Pittsford, New York)

23                  Counsel for Eastman Kodak

24

25
```

5

```
 1   APPEARANCES:  (Continued)

 2

 3        POTTER ANDERSON & CORROON, LLP
          BY:  RICHARD L. HORWITZ, ESQ.
 4
                    Counsel for Concord Cameras, Dell, Inc.
 5                  Fujitsu Limited, Fujitsu America, Inc.,
                    Fujitsu Computer Products of America, Inc.,
 6                  Toshiba Corporation, Toshiba America, Inc.,
                    Wintek Electro-Optics Corporation, Sanyo
 7                  Electric Co. Ltd. and Sanyo North America,
                    Philips Electronics North America Corp.
 8                  and Samsung SDI

 9             and

10        FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP
          BY:  BARRY W. GRAHAM, ESQ.
11             (Washington, District of Columbia)

12                  Counsel for Nikon Corporation, Nikon Inc.

13             and

14        KATTEN MUCHIN ROSENMAN
          BY:  MICHAEL A. DORFMAN  ESQ.
15             (Chicago, Illinois)

16                  Counsel for Sanyo Electric Co. Ltd.
17                  and Sanyo North America

18             and

19        OBLON SPIVAK MCCLELLAND MAIER & NEUSTADT, P.C.
          BY:  CARL E. SCHLIER, ESQ.
20             (Alexandria, Virginia)

21                  Counsel for Toshiba America

22             and

23        VINSON & ELKINS
          BY:  RODERICK B. WILLIAMS, ESQ.
24             (Austin, Texas)

25                  Counsel for Dell, Inc.
```

United States District Court for the District of Delaware
Before the Honorable Kent A. Jordan

SHEET 3

**6**

1  APPEARANCES: (Continued)

2

3  MILBANK TWEEK HADLEY & McCLOY, LLP
4  BY: CHRISTOPHER E. CHALSEN, ESQ.
        (New York, New York)

5

6      Counsel for Fujitsu Limited, Fujitsu
       America, Inc., Fujitsu Computer Products
7      of America, Inc.

8      and

9  FINNEGAN HENDERSON FARABOW GARRETT & DUNNER, LLP
   BY: YORK FAULKNER, ESQ.
        (Reston, Virginia)

10     Counsel for Wintek Electro-Optics
       Corporation

11

12     and

13 HOWREY SIMON ARNOLD & WHITE, LLP
   BY: ALAN M. GRIMALDI, and
       NELSON M. KEE, ESQ.
14     (Washington, District of Columbia)

15     Counsel for Philips Electronics
       North America Corp.

16

17     and

18 PAUL HASTINGS JANOFSKY & WALKER, LLP
   BY: STEPHEN S. KORNICZKY, ESQ.
        (San Diego, California)

19

20     Counsel for Samsung SDI

21     and

22 CONCORD CAMERA CORP.
   BY: SCOTT L. LAMPERT, ESQ.
        (Hollywood, Florida)

23

24     Counsel for Concord Camera

25

---

**8**

1  APPEARANCES: (Continued)

2

3  BOUCHARD MARGULES & FRIEDLANDER
   BY: KAREN L. PASCALE, ESQ.

4

5      and

6  OBLON SPIVAK McCLELLAND MAIER & NEUSTADT, P.C.
   BY: ANDREW M. OLLIS, ESQ.
        (Alexandria, Virginia)

7

8      Counsel for Optrex America, Inc.

9  McCARTER & ENGLISH
   BY: THOMAS D. WALSH, ESQ.

10

11     Counsel on behalf of Optrex America

12 CONNOLLY BOVE LODGE & HUTZ
   BY: JAMES MICHAEL OLSEN, ESQ.

13

14     Counsel on behalf of Sony Ericsson AB
       and Sony Ericsson, Inc.

15

16

17

18

19

20

21

22          - oOo -

23      P R O C E E D I N G S

24 REPORTER'S NOTE: The following proceedings were

25 held in open court, beginning at 10:40 a.m.)

---

**7**

1  APPEARANCES: (Continued)

2

3  SACHNOFF & WEAVER
   BY: BRIAN D. ROCHE, ESQ.
4       (Chicago, Illinois)

5      Counsel for Argus a/k/a Hartford
       Computer Group, Inc.

6

7  POTTER ANDERSON & CORROON, LLP
   BY: PHILIP A. ROVNER, ESQ.

8

9      and

   STROOCK & STROOCK & LAVAN LLP
10 BY: LAWRENCE ROSENTHAL, ESQ.
        (New York, New York)

11

       Counsel for Fuji Photo Film Co., Ltd.
12     And Fuji Photo Film U.S.A. Inc.

13

   DUANE MORRIS
14 BY: D. JOSEPH ENGLISH, ESQ.
        (Washington, District of Columbia)

15

       Counsel for Audiovox Communications Corp.

16

17 YOUNG CONAWAY STARGATT & TAYLOR
   BY: ADAM WYATT POFF, ESQ.

18

19     and

20 GREENBLUM and BERNSTEIN, PLC
   BY: MICHAEL J. FINK, ESQ.
        (Reston, Virginia)

21

       Counsel for Pentax Corporation,
22     Pentax U.S.A, Inc.

23

24

25

---

**9**

1      THE COURT: Counsel, this is Judge Jordan. I
2  apologize keeping you waiting. The folks who were in the
3  queue ahead of you exceeded their allotted time but we were
4  able to work some things out and I appreciate your patience.
5      Why don't we go ahead and I'll get a roll call
6  from you folks of who is on the line and who you represent.
7  Okay? Let's start with the plaintiff.
8      MR. GRIMM: Good morning, Your Honor. It's Tom
9  Grimm at Morris Nichols for Honeywell. On the line with me
10 today; first, Your Honor may recall Honeywell filed two
11 separate actions so on the line with me also is John Day of
12 the Ashby & Geddes firm.
13     Our co-counsel on the line with us this morning
14 are Martin Lueck, Matt Woods and Stacie Roberts at the
15 Robins Kaplan Miller & Ciresi firm. And also on the line
16 this morning with us is David Brafman, Intellectual Property
17 counsel for Honeywell. And that's for all plaintiff
18 Honeywell.
19     THE COURT: All right. Let's just start down
20 the list of defendants. Go ahead.
21     MR. HORWITZ: Your Honor, this is Rich Horwitz
22 at Potter Anderson on behalf of a number of defendants. And
23 with me on the line, I'll go through the list.
24     THE COURT: Well, you need to tell me which
25 defendants you are here for. I know this is —

SHEET 4

10

1   MR. HORWITZ: That's fine. I'm on the line for
2   Dell, Fujitsu, Concord Camera, Toshiba, Nikon, Samsung SDI,
3   Sanyo, Wintek and Philips.
4       And with me on the line for Dell, Rick Williams;
5   for Philips, Alan Grimaldi and Nelson Kee; for Fujitsu,
6   Christopher Chalsen; for Sanyo, Michael Dorfman; for
7   Toshiba, Carl Schlier; for Nikon, Barry Graham; for Wintek,
8   York Faulkner. We are on alone for Concord Camera. And for
9   Samsung SDI, Stephen Korniczky.
10      MR. LAMPERT: One correction. This is Scott
11  Lampert for Concord Camera.
12      MR. HORWITZ: I'm sorry, Scott. I didn't
13  realize you were on.
14      THE COURT: All right. Thanks.
15      Is there anybody else on?
16      MR. WADE: Your Honor, it's Bill Wade at
17  Richards Layton & Finger, and I'm on for the Matsushita
18  defendants along with Steve Rizzi and perhaps David Lender
19  from Weil, Gotshal & Manges.
20      MR. BENSON: Your Honor, this is Robert Benson
21  of Hogan & Hartson on for Seiko Epson and Kyocera Wireless.
22      MR. KATZENSTEIN: Your Honor, this is Robert
23  Katzenstein. I'm Mr. Benson's local counsel.
24      MR. HALKOWSKI: Your Honor, this is Tom
25  Halkowski on behalf of Nokia, Apple and Casio. And with me

12

1   & English on behalf of Audiovox Electronics Corporation.
2       MR. POFF: Your Honor, Adam Poff from Young
3   Conaway on behalf of the Pentax defendants. And also
4   Michael Fink from Greenblum and Bernstein on behalf of
5   Pentax.
6       MR. SHAW: Your Honor, John Shaw for the Olympus
7   and Sony defendants, and I believe Richard Rosati and Bob
8   Hails is for Olympus.
9       MR. ROSATI: Rich Rosati for Olympus.
10      MR. SHAW: And Bob Hails is for the Sony
11  defendants.
12      THE COURT: Okay.
13      MR. OLSEN: Your Honor, James Olsen from
14  Connolly Bove for the Sony Ericsson defendants.
15      MR. ENGLISH: Your Honor, this is Joe English
16  from Duane Morris on behalf of Audiovox Communications Corp.
17      THE COURT: And do we have anybody else on?
18      MR. FLOCK: Your Honor, this is John Flock from
19  Kenyon & Kenyon, also on for Sony corporation.
20      THE COURT: Thank you.
21      MS. PASCALE: Your Honor, this is Karen Pascale
22  from Bouchard Margules & Friedlander for Optrex America
23  which is the named plaintiffs in the 04-1536 action; and on
24  the line with me is Andrew Ollis from the Oblong Spivack
25  firm.

11

1   on the line on behalf of Nokia is Lauren Degnan; and on
2   behalf of Apple, Kelly Hunsaker; and on behalf of Casio,
3   John Johnson and Lewis Hudnell. Thank you.
4       THE COURT: All right.
5       MR. ROVNER: Your Honor, this is Phil Rovner for
6   the Fuji Photo Film defendant. With me on the line is Larry
7   Rosenthal from Stroock Stroock & Lavan in New York.
8       THE COURT: Okay.
9       MR. ROCHE: Your Honor, Brian Roche in Chicago
10  for Hartford Computer Group.
11      THE COURT: And is somebody on with you, sir, as
12  local counsel?
13      MR. ROCHE: No.
14      THE COURT: Have you arranged for local counsel?
15      MR. ROCHE: Yes, we have local counsel from
16  Cross & Simon.
17      THE COURT: All right. Typically, we look for
18  those folks to be on those calls too unless excused. But
19  thanks for identifying yourself.
20      Who else is on?
21      MR. SHANDLER: Your Honor, Chad Shandler for
22  Richard Layton for Eastman Kodak. With me on the line is
23  Neal Slifkin from Harris Beach.
24      THE COURT: Anybody else?
25      MR. WALSH: Your Honor, Tom Walsh with McCarter

13

1       THE COURT: Okay. Do I have anybody else?
2       (Pause.)
3       THE COURT: All right. Well, thanks for
4   assembling. I'm glad the telephone company has got enough
5   lines to handle this call.
6       We are together because in spite of what I
7   thought was pretty clear direction a few months ago, we
8   still haven't been able to get plaintiffs and defendants
9   moving forward on this case, and I received a letter on
10  August 22nd from Mr. Grimm saying, "hey, since our
11  correspondence to you in June, we're still at odds."
12      So, I've taken a look at the correspondence but
13  why don't I give you a chance to tell me what you think the
14  points in dispute are that can't be resolved without my
15  intervention so we can get a scheduling order in place,
16  short of me just imposing one.
17      Who is speaking on behalf of the plaintiffs on
18  this?
19      MR. GRIMM: Your Honor, this is Tom Grimm.
20  Marty Lueck of the Robins Kaplan Miller & Ciresi firm will
21  speak.
22      THE COURT: Mr. Lueck.
23      MR. LUECK: Good morning, Your Honor. I think I
24  can give you a snapshot here of where we've made progress,
25  where we haven't and I think give the Court an idea of how

Friday, September 9, 2005

SHEET 5

14

1  we might be able to resolve the logjam so we can transition
2  this case from the customer defendants to the module maker
3  defendants.
4       Basically, what we have asked for in discovery
5  from the customer defendants is a list of all products sold
6  in the United States in the categories that are set forth
7  in the complaint going back from October 6th, 1998 to the
8  present. And we've asked for the identity of a module maker
9  for each of those products and the LCD module model number.
10  And the reason we've asked for that information is so that
11  we can match up the LCD modules that were manufactured
12  overseas to the end products that were actually imported
13  into the United States and sold because those are the ones
14  that are going to be at issue for both liability and
15  ultimately, down the road, damage.
16       THE COURT: All right. I'm sorry to interrupt,
17  Mr. Lueck. Give it to me one more time. What is it that
18  you specifically asked for in discovery?
19       MR. LUECK: What we're asking for is a list of
20  all -- and let me just back up. This is for the customer
21  defendants. A list of all products sold in the United
22  States in the categories set forth in the complaint from
23  October 6th, 1998 to the present. And that's consistent
24  with the patent statute of limitations, six years back from
25  the date of filings of the complaint. The products.

15

1       THE COURT: All right. Now, before you go
2  further, let me ask you what I took it to be the other
3  side's position and just have you respond to it directly.
4       I think they were saying to saying to me, these
5  guys should be identifying the products they think infringe
6  in the first instance. Am I right that that is a point of
7  contention or am I wrong about that?
8       MR. LUECK: You are correct, Your Honor, as to
9  some of the defendants.
10       THE COURT: What is your response?
11       MR. LUECK: Our response to that is we have
12  identified all of the products that we have purchased and
13  torn down and found specific instances of infringement.
14  We're unable to buy every product that is out there, and in
15  fact for the products that are in the past, we have no idea
16  whether we would have all of those or not have all of them.
17  And we don't believe on a going-forward basis, it should be
18  our burden to buy every single product of every single
19  company, tear it down and then make an individual charge of
20  infringement.
21       We have given them all the information we have
22  to date. And, in addition, we have offered to tear down
23  any products they want to send us and we will give them a
24  response on the results of that tear-down. And that really
25  is the logjam right there. We have resolved that issue with

16

1  three of the defendants, Nikon, Concord Camera and Fuji. I
2  believe we're close to resolving it with Nokia and Olympus
3  but were unable to make progress with the others.
4       THE COURT: All right. And what is the basis of
5  your agreement with the ones you have resolved it with?
6       MR. LUECK: In essence, Your Honor, they have
7  agreed to provide us that information: A historical list of
8  products going back to 1998, the identity of the module
9  maker for each product and the LCD module number that is in
10  the product.
11       THE COURT: All right. And is that really the
12  heart of the dispute? Is there some other thing going on
13  that I need to know about or is this really a kind of an
14  Alphonse-and-Gaston thing about who goes through the door
15  first?
16       MR. LUECK: Yes, I think that is correctly
17  summarized, Your Honor. I believe if we can resolve this
18  issue, we can make a lot of progress to resolving everything
19  else.
20       THE COURT: Okay. Who wants to take this up in
21  the first instance for the defendants?
22       MR. HORWITZ: Your Honor, this is Rich Horwitz.
23  I think that you have captured what the main
24  dispute is and, really, it boils down to who should go
25  first. Based on what Your Honor told us when we were in

17

1  front of you, I think we quoted the language from the
2  transcript where we think it's their obligation to come
3  first as the plaintiff charging infringement.
4       There may be some defendants who want to speak
5  specifically because the burdens on defendants are different
6  depending on how many products fall within the eight
7  categories that were mentioned in the complaint for the time
8  period that we're talking about here, to reach back and grab
9  things for plaintiff with no firm charge of infringement.
10  And I think that is the nub of the controversy.
11       There are some other issues that haven't been
12  discussed yet today that plaintiff raised in its submissions
13  and we responded to that we thought were outside the scope
14  of what the Court ordered, but that is kind of a collateral
15  matter to the main issue which is the one that you have been
16  focusing on so far.
17       So if there are individual defendants, I think
18  that they should be able to jump in at this point, if they
19  want to add argument on their specific circumstances.
20       THE COURT: Okay. Who wants to speak? Don't be
21  shy.
22       MR. GRAHAM: Your Honor, this is Barry Graham
23  for the Nikon defendants. And I hope everyone can hear me
24  well. I had to be on a cell phone today.
25       As Mr. Lueck acknowledged, which I appreciate,

SHEET 6

18

1  that Nikon has resolved, has given Honeywell what it asked
2  for. We gave them specific information in July, and the way
3  I read the Court's May 18th order, Nikon and other customer
4  defendants were under basically a conditional stay. And I
5  would like, at least for Nikon, and there may be others, to
6  ask the Court to change the conditional stay into a real
7  stay while the other parties resolve their differences with
8  the plaintiff.
9         THE COURT: All right. Does anybody else want
10  to speak?
11        MR. ROSENTHAL: Your Honor, this is Lawrence
12  Rosenthal for Fuji.
13        In fairness to the other defendants who still
14  have this dispute, as you may recall, Fuji asked the Court
15  to limit the case to the eight categories. Honeywell has
16  now conceded that is what the case is limited to. And if
17  the case is limited to eight categories, this case becomes a
18  single product case for Fuji and the burden became finite
19  and easy to satisfy. I think you will hear from other
20  defendants that that is not the case.
21        THE COURT: Is there anybody else?
22        MR. RIZZI: Your Honor, this is Stephen Rizzi of
23  Weil Gotshal for the Matsushita defendants.
24        Just to give you a sense of an example where
25  we're not similarly situated to some of these defendants

20

1  Mr. Lueck, back to you. I'll give you a chance to rebut.
2         MR. LUECK: Thank you, Your Honor. Basically
3  it's hard for me to understand how the burden could be
4  greater on the defendants to provide this information than
5  on Honeywell to go out and try to uncover every product that
6  each of these defendants have sold in the past.
7         THE COURT: Well, wait. I've got to wrestle
8  with you on that premise because at the start, I moved from
9  the baseline understanding that the way our adversary system
10  works is you learn of something that tells you you've been
11  wronged and then you go and you draft a complaint that
12  identifies that wrong and you come to court and you bring
13  somebody in to answer for that wrong. So when you start by
14  saying, gee, let's look at who has got the greater burden
15  here, why is it the burden of defendants in the first
16  instance to tell you everything they ever made with an LCD
17  module in it when there's apparently a reluctance or
18  unwillingness or inability on your part in the first
19  instance to make a case that a product actually does
20  infringe?
21         I'm probably giving away the way I'm thinking
22  right now, aren't I? I'm having a real problem with the
23  fundamental premise with your argument which is we think
24  there is other stuff out there that infringes and we want to
25  know everything you made in the last six years so we can

19

1  like Nikon and Fuji, Matsushita is a very diverse
2  electronics company and has products that span many of the
3  categories. And if you literately consider going back six
4  years, all LCD-containing products in those categories,
5  there are hundreds, if not perhaps more than a thousand
6  products in this action.
7         Honeywell has identified three products of
8  Matsushita that are accused of infringement. We, months
9  ago, told Honeywell who the LCD suppliers are for those
10  products: two cell phones and one laptop. And just as sort
11  of a fundamental matter of discovery and burden shifting,
12  we don't believe that identification of three products
13  justifies discovery of hundreds, if not perhaps a thousand
14  products that may or may not be accused of infringement.
15  The burden is squarely on Honeywell to identify which
16  products they believe infringe and the case should be framed
17  around those products. And we do not believe that merely
18  identifying three products justifies essentially a fishing
19  expedition into all products going backs six years which
20  could number well into the hundreds, if not more.
21        THE COURT: Okay. I got you.
22        Does anybody else feel like they want to say
23  something?
24        (Pause.)
25        THE COURT: All right. Hearing nothing,

21

1  decide whether we got a case against you or not. That just
2  isn't how it works.
3         MR. LUECK: Well, Your Honor, I believe we have
4  made that showing. And what we have done is we've gone out
5  and bought a large number of products from a wide range of
6  customers or end manufacturing defendants. We've torn them
7  down. We've given the defendants detailed information on
8  what we believe is the infringement. We identified the
9  eight product ranges where we found it.
10        The modules come from module makers overseas.
11  We have no access to those individuals. And I think we've
12  satisfied our Rule 11 burden, we satisfied the pleading
13  burden on it, and then it becomes an issue of whether or
14  not this is reasonably calculated to lead to admissible
15  information, which we believe it is, and then it is an issue
16  of looking at the relative burdens. And in our view on
17  burden, we have a right to recover for damages going six
18  years back from the date of the complaint. These models
19  change rapidly and often. And we simply have no access to
20  records that would show us what those models have been.
21        THE COURT: Well, let me ask this, because
22  maybe we're talking past each other. When you say you have
23  satisfied your initial burden, is the assertion that you are
24  making that we have identified products, we've told them the
25  products that infringe and the only question is whether,

Friday, September 9, 2005

SHEET 7

22

1  through various generations of different models of this
2  product, somehow there is some difference? Or is there
3  something else going on that I'm not getting.
4       MR. LUECK: No, I think you have captured it.
5  We've identified what the products are that have infringed
6  and we've specified what those types of products are and
7  we've given them specific model numbers as to ones we've
8  been able to purchase and tear down, but that doesn't mean
9  that we know all of the generations of those products that
10 they have introduced in the past.
11      THE COURT: All right. I'm going to ask the
12 gentleman who spoke on behalf of Matsushita, the Weil
13 Gotshal attorney if he will speak up at this point and
14 answer that point, which is: Hey, we're not just on some
15 wholesale fishing expedition. We've identified a product
16 and a product line and we just need to know the different
17 model numbers in that product line so that we're sure that
18 we've had a chance to investigate this product thoroughly,
19 which is what I understand Mr. Lueck to be saying. What is
20 your response to that?
21      MR. BRAFMAN: Your Honor, this is David Brafman
22 from Honeywell.
23      I'd just like to add one further point which is
24 our tear-down rate, on average it's about a 50 percent hit
25 rate under our belief of infringement across all these

23

1  products. So it's not a wild fishing expedition as it is
2  made to sound. It is that we found products, a large
3  percentage of them do hit and we just don't have access to
4  the models that change every six months.
5       THE COURT: All right. Mr. — I'm sorry, I've
6  forgotten your name, sir.
7       MR. RIZZI: It's Steve Rizzi from Weil Gotshal.
8       THE COURT: Mr. Rizzi, I apologize for not
9  holding on to that name. Go ahead.
10      MR. RIZZI: That's okay. I think along those
11 lines, Your Honor, there is room to meet in the middle here
12 from our perspective and, in fact, one of the cases that
13 Honeywell cited in its correspondence I believe is
14 instructive — the IP Innovation case out of the Northern
15 District of Illinois — I think is somewhat similar in the
16 sense that case involved certain chips that were found
17 in various models of televisions that were accused of
18 infringement, the basis for infringement being this specific
19 chip. And what the plaintiff did originally was identify
20 specific television models that they believe included the
21 chip and were infringing. And there, the Court allowed
22 discovery of other models of televisions that included that
23 same chip. So discovery in the case were structured
24 around other future generations or products but only those
25 products that included the same chip as the specific models

24

1  of televisions that were identified by plaintiff.
2       We think structuring it along those lines is
3  reasonable and does provide a framework that does allow
4  for a manageable case as well. And that we believe it is
5  possible to identify, for example, other products that
6  utilize the same LCD modules incorporated in these specific
7  products that are alleged to infringe and that we don't
8  believe that that would present an unreasonable burden,
9  and we don't dispute that plaintiffs would be entitled to
10 that type of information.
11      THE COURT: All right. Mr. Lueck.
12      MR. LUECK: Yes. What we asked for, Your Honor,
13 is the modules that were identified in the infringing
14 products and similar modules. And the problem we have is if
15 you were to go to these module makers, some of the modules
16 infringe, some of the modules don't. The module makers do
17 not know what products they go into for the customers.
18 Literally, the only way for anyone to find that out is to
19 ask them for the historical products. And we've offered to
20 take anything that they have and look at it and tell them
21 whether it infringes.
22      I don't believe the burden is as great as the
23 defendants are saying. We've narrowed it down to specific
24 products we've torn down. We don't know all of the
25 historical model numbers. That's the information we're

25

1  asking for.
2       THE COURT: All right.
3       MR. WILLIAMS: Your Honor, this is Rick Williams
4  for Dell.
5       THE COURT: Yes.
6       MR. WILLIAMS: I'd like to weigh in on this. In
7  the complaint, the products they're looking for include
8  cellular phones, digital cameras, PDAs, portable DVD
9  players, laptop computers. In the case of Dell, they
10 identified six models of Dell laptop computers out of a
11 total current 17 models.
12      The first thing, all of Dell's laptops are
13 readily available to purchase over the Internet and they can
14 get them within a week's time and evaluate them.
15      They have not identified any PDAs, which Dell
16 also sells.
17      Dell resells digital cameras and digital video
18 cameras. They have not identified any of those as being
19 accused against Dell.
20      So we're faced with the dilemma, out of all
21 these categories, they say they'd like information on —
22      THE COURT: Well, we're not —
23      MR. WILLIAMS: — them going down the list and
24 giving them information.
25      THE COURT: Hold on. Because I get the feeling

Friday, September 9, 2005

SHEET 8

26

1   we're still talking past one another here. Maybe positions
2   have shifted as a result of the conversation we're having,
3   but what I hear what Mr. Lueck is saying is not I want
4   information about broad categories of products. I want
5   information about a specific product identified and
6   different generations of that same identified product. That
7   is, has a model changed? And if it has changed, would you
8   please identify what the newer different model is of that
9   identified product? Not category of products but a
10  specified product.
11          Mr. Lueck, have I misunderstood you?
12          MR. LUECK: Well, I think that is narrower than
13  we seek, Your Honor. I mean if it's going to be tied to
14  specific model numbers, we don't know what the past model
15  numbers these devices are marketed under. Basically what
16  we're asking for is which of your products had the modules
17  that had the infringing technology or the similar technology
18  in them so we can tie them back to the module makers and
19  know what modules were imported into the United States.
20          THE COURT: All right. I interrupted.
21          MR. LUECK: That could be a different model
22  number than what we have, we just don't know that, and we
23  have no other way of finding out.
24          THE COURT: The gentleman from Dell, I
25  interrupted you, sir. Go ahead.

27

1           MR. WILLIAMS: No, Your Honor. Again, they
2   identified six models out of 16-17. They could certainly
3   get the other models. Through the tear-down, they could
4   purchase them as easily as Dell could absorb the expense and
5   tell us the modules in fact they're accusing of infringement
6   rather than asking us to go back and conduct a unilateral
7   analysis of our products and say, well, maybe this module
8   infringes or maybe this one doesn't. And I think the burden
9   should be on them in the first instance to say a particular
10  LCD module in a particular computer model we contend meets
11  the elements of the claims in our patent instead of
12  vice-versa.
13          THE COURT: All right. And I am going to have
14  to get into a criminal proceeding here in a few minutes, so
15  I won't have an opportunity to resolve other issues that you
16  may have besides this one.
17          My understanding of what is being asked for has
18  shifted a little bit in the course of this conversation.
19  So instead of trying to speak in terms of what it is you
20  are asking for, let me tell you what I think you can
21  legitimately ask for and we can get this thing moving
22  forward.
23          I said in the order that I put out last May that
24  Honeywell was required to specifically identify accused
25  products. And that's what I meant. Not that Honeywell was

28

1   entitled to say, you know, we think all your cellular phones
2   infringe so we want you to tell us everything about all your
3   cellular phones. What I mean is if you've got a basis for
4   believing that a manufacturer's cellular phones are
5   infringing, and I mean you can say we've done this tear-down
6   on these specific products and these things appear to us to
7   infringe, well, then you are absolutely entitled to conduct
8   additional discovery with respect to those products, that
9   is, were earlier generations than the one you tore down.
10  Also, have they come out with subsequent generations of that
11  same model which could also be infringing?
12          But what you are not entitled to do is to say
13  you manufacture 15 different kinds of cell phones. We tore
14  down three. Tell us about your other 12. Because I agree
15  with the defendants that now what you are doing is you are
16  telling manufacturers, you know what? You got one or two
17  things that are bad. We want to you do an analysis of
18  everything you make and tell us whether you are guilty on
19  those fronts, too; and that is not what the law requires,
20  and it's not what I'm going to require them to do.
21          If you want to go out, you want to buy them, you
22  want to do the tear-downs, you want to get information that
23  prompts you to be able to say "now I know that this specific
24  model also infringes," then you can certainly do that. And
25  then you would be in an area where you could be requiring

29

1   additional discovery from them. But to ask them to come
2   forward in the first instance, which is what it really comes
3   down to, is not right.
4           So I hope this straightens out where my thinking
5   is on it and gives you guidance about what I'm expecting the
6   parties to be willing to do. To the extent manufacturers
7   are prepared to say, you know what? For us, it's not such a
8   burden as to make it impossible to give you something more
9   broad than what the judge has ordered happen, that is fine
10  with me. But what I do expect to happen at this juncture is
11  for you guys to come together with a specific set now of
12  identified products and manufacturers of the models of LCD
13  modules that go into those products so that we can go about
14  having the proper defendants in the suit.
15          To the extent there was any thought that I was
16  putting the burden exclusively on the defendant retailers or
17  intermediate sellers, to third-party people in, that is not
18  necessarily the case. I'm not going to get to that issue
19  today, though, because we don't have time to fully explore
20  it, but I expect Honeywell to be active in finding out who
21  those manufacturers are and that is one of the reasons why
22  I gave only a conditional stay, because one of the pieces
23  of information Honeywell is entitled to get as to those
24  identified products and product lines is who is the maker of
25  the LCD that is going in to that product, that generation of

Friday, September 9, 2005

SHEET 9

30

1  product and maybe, I don't know, the generations before and
2  after that model.
3      So you guys absolutely on the defense side have
4  to give that information up. And then if we can't have some
5  sensible plan that the parties agree to on how to try to
6  bring those folks in, I'll get into the mix on that, too. I
7  would think that overseas marketers of LCD modules who have
8  big clients in the United States incorporating those things
9  into their products are not going to want to upset their
10  clientele by playing games with jurisdiction. And
11  particularly in the aftermath of the Federal Circuit's
12  CEA decision, which I remember well, I would think people
13  would be thinking hard about how they're going to play
14  the personal jurisdiction defenses here. But that is a
15  discussion for another day.
16      For now, I want you to get off of the
17  who-goes-first issue because Honeywell you guys are going
18  first. You identify what is infringing. Let's get those
19  manufacturers on notice and let's get the case going
20  forward.
21      When can I expect to hear back from you about a
22  plan for getting that done, Mr. Lueck?
23      MR. LUECK: Within a week, Your Honor. If I
24  could ask for just one clarification, recognizing you have
25  something else going.

31

1      The issue that we've had is just identifying who
2  the manufacturers of the modules are that are coming into
3  the U.S. And hearing what Your Honor has said regarding
4  those modules, can we ask about historical products that
5  have those modules or similar modules in them?
6      THE COURT: Well, when you say the "same" or
7  "similar," you know, the "same," absolutely. When you say
8  "similar," that is a big door, because, what do you mean
9  when you say "similar?"
10      MR. LUECK: Right. Here is what I mean when I
11  say "similar," Your Honor. A light source, an LCD panel,
12  two lens arrays, one of which is misaligned.
13      THE COURT: If you want to say, if you want to
14  frame your discovery in a manner that incorporates your
15  specific allegations of infringement, fine.
16      MR. LUECK: That is exactly what we're asking
17  for. And that we would frame it exactly that way.
18      THE COURT: All right. Does everybody
19  understand the discovery I'm telling them they're entitled
20  to?
21      (Pause.)
22      THE COURT: I'm not hearing anybody say no.
23      MR. HORWITZ: Your Honor?
24      THE COURT: Yes, go ahead.
25      MR. HORWITZ: This is Rich Horwitz. And I'll

32

1  defer to others if I'm missing something here, but I think
2  the problem with what Mr. Lueck just said is he may be
3  asking for things that led us to the stay motion in the
4  first instance.
5      THE COURT: No. What led to the stay motion in
6  the first place is I'm not going to have the folks who are
7  reselling things, reselling the LCD module as a part of
8  their own product defending in the first instance.
9      MR. HORWITZ: I'm sorry. I understand that,
10  Your Honor. What I meant was that some of the people that
11  are the resellers may not have the information that would
12  respond to the broad question that Mr. Lueck just posed.
13      THE COURT: Well, and if you don't have it, you
14  don't have it.
15      MR. HORWITZ: Okay.
16      THE COURT: I mean I'm not saying anybody has to
17  make anything up, but if you've got the information, you
18  need to give it up because they're entitled to get behind
19  your products and get it to people who are making them if
20  they can get jurisdiction over them. And that's all.
21      Like I said, the personal jurisdiction issue,
22  that's for another day. But finding out who the
23  manufacturers are, that's something that is supposed to have
24  been happening over the course the last four months and it's
25  distressing to hear that we've been not moving forward on

33

1  that front because we should be. We should be finding out
2  who this case is going to run against in the first instance.
3  So I'll ask the parties to move forward with that forthwith;
4  all right?
5      And, Mr. Lueck, I'll look forward to hearing
6  from you some time in the next few days in a fashion that
7  includes discussions to the extent you need to have it with
8  all defense counsel on how you folks intend to proceed so
9  that I can get a scheduling order in place.
10      I'm going to set a deadline on you folks
11  reporting back to me for two weeks from today; all right?
12  And hopefully that can be a joint submission. But if it
13  can't given, the number of parties involved, it may be
14  impracticable, I'll expect though to hear from everybody
15  with a position on scheduling because what you can expect
16  from me is I'm ready to put an order in place. I want to
17  get a schedule in place. So you should be talking about how
18  to make that happen.
19      All right. Is there any other matter which is
20  of such urgency we ought to address it right now while we're
21  all on the phone right now, Mr. Lueck?
22      MR. LUECK: No, Your Honor.
23      THE COURT: From the defense side, anything?
24      MR. HORWITZ: No, Your Honor.
25      THE COURT: Okay. I'm hearing --

SHEET 10

34

1       MR. GRIMM: Your Honor?
2       THE COURT: Yes.
3       MR. GRIMM: Your Honor, this is Tom Grimm.
4       I do have a concern of letting this go on and on
5   because we've had such a hard time in the last three or four
6   months. And this has been very helpful to us but I'm
7   wondering if we could bother the Court for your permission
8   that in two weeks after we report, if there is still
9   differences, can we contact your clerk and ask for another
10  telephone conference?
11      THE COURT: Well, that is something you are
12  always free to do. If there is a problem in the case that I
13  can help you work out, I'm ready to help you work it out.
14  But I'm fully expecting on the basis of the discussion we
15  just had, for you to be able to take the next step, which is
16  set a schedule for getting this case transitioned to an
17  infringement suit against the manufacturers. All right?
18      MR. GRIMM: All right.
19      MR. GRAHAM: Your Honor, this is Barry Graham
20  for Nikon.
21      Nikon would like to be able to step aside. Do
22  we need to participate since we already provided the
23  information to Honeywell?
24      THE COURT: The short answer is if Honeywell
25  and you agree that you don't have anything else to say with

---

35

1   respect to the case, I'm not going to default you. And at a
2   certain point in time, there will be a transition from a
3   conditional stay to a full stay but I don't want to handle
4   that on a defendant-by-defendant basis if I can help it, so
5   I'm not moving on that request that you made earlier in this
6   call at this time.
7       MR. GRAHAM: All right. Thank you, Your Honor.
8   I'll speak with plaintiffs' counsel.
9       THE COURT: All right. Well, thanks for your
10  time this morning. Good-bye.
11      (The attorneys respond, "Thank you, Your
12  Honor.")
13      (Telephone conference ends at 11:18 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25